473 F.2d 561
 ILLINOIS STATE EMPLOYEES UNION, COUNCIL 34, AMERICAN
FEDERATION OF STATE, COUNTY AND MUNICIPAL
EMPLOYEES, AFL-CIO, an unincorporated
labor organization, et al.,
Plaintiffs-Appellants,
v.
John W. LEWIS, individually and as Secretary of State of the
State of Illinois, Defendant-Appellee.
 No. 71-1619.
 United States Court of Appeals,
Seventh Circuit.
 Argued Feb. 29, 1972.
Decided Sept. 18, 1972.
Certiorari Denied Feb. 20, 1973.
See 93 S.Ct. 1364, 1370.
 
 Gilbert A. Cornfield, Chicago, Ill., for plaintiffs-appellants.
 Don H. Reuben, Lawrence Gunnels, James C. Munson, Steven Handler, Robert A. Tingler, Asst. Atty. Gen., Chicago, Ill., Waldo Ackerman, Asst. Atty. Gen., Springfield, Ill., for defendant-appellee.
 Before KILEY and STEVENS, Circuit Judges, and CAMPBELL,* District Judge.
 STEVENS, Circuit Judge.
 
 
 1
 The question presented is whether a public employee may be discharged for failing to support the partisan political activities of his immediate superior. Defendant contends as a matter of fact that plaintiffs were not discharged for any such reason and as a matter of law that such a reason is sufficient until political tradition-at least the patronage aspects of the "spoils" system-is superseded by appropriate legislation. We conclude that neither defendant's factual nor his legal defense has been established in this case. We start with the facts.
 
 I.
 
 2
 The individual plaintiffs were employed by the late Paul Powell in the Illinois Secretary of State's office; all of them held non-civil service positions as building employees, clerical workers, license examiners and the like. After the defendant John W. Lewis was appointed by Governor Ogilvie to fill the unexpired term of Paul Powell, the plaintiffs received letters terminating their employment; the letters stated no reasons for the termination.
 
 
 3
 The plaintiffs later filed this action claiming that they were discharged because of their political affiliations, i. e., because they refused to become Republicans or to support the Republican Party and that a hearing would so show; plaintiffs claim that such discharge violated their rights under the First and Fourteenth Amendments to the U. S. Constitution.[1] The complaint predicated federal jurisdiction upon the Civil Rights Act of 1871, 42 U.S.C. Sec. 1983, and sought relief reinstating plaintiffs to their jobs, awarding them back pay and enjoining future discharges of other employees such as the plaintiffs.
 
 
 4
 Defendant filed a motion for summary judgment. The motion was supported by defendant's affidavit describing in detail conditions of widespread inefficiency and confusion which he found to exist in the Secretary of State's Office when he was appointed.[2] Defendant's affidavit stated that "the efficiency of the office was at such a low ebb that in order to protect the public and to prevent a total breakdown of the Secretary of State's Office, it was vitally and immediately necessary to make large scale changes in the manner in which the office was being run and in the ranks of personnel that were then employed."
 
 
 5
 In opposing defendant's motion for summary judgment, plaintiffs sought to develop evidence which would dispute defendant's factual theory. They propounded written interrogatories to the defendant[3] and filed 94 affidavits of discharged employees. Each affiant described his duties and set forth facts tending to indicate that his job performance was satisfactory and that his discharge had been politically motivated.
 
 
 6
 Five of the affiants said that they had been contacted and requested to change their affiliations to the Republican Party. Thus, as an example, the handwritten affidavit of the plaintiff William Perry states that he was employed as a janitor in the Illinois State Building from October 1, 1965, to March 5, 1971,[4] and was told by his supervisor, Mr. Reed, that he would be able to keep his job if he joined the Republican Party. Affiant Betty Jean Sikes swore that she "was approached by Mr. W. Estes of the Republican Party-Who filled out a paper-and said I would be retained in my present position but I would have to vote Republican."[5] Robert D. Wise, a driver's license examiner who conducted road tests in Joliet, Illinois, swore that he "was approached by Mr. Hall, of the Republican Party, and he told me I would have a better chance of staying if I would change over to the Republican Party or Republican sponsorship. This was told to all members of the station at 4:30 P.M., at a meeting conducted by Mr. Hall, who also said that we would be replaced as soon as they acquired new employees (Republicans)."[6]
 
 
 7
 The district court entered summary judgment for defendants and also entered "findings of fact" and conclusions of law. In substance, the court found that defendant's version of the facts was correct. Implicitly the court held that plaintiffs' affidavits were insufficient as a matter of law and that the answers to plaintiff's interrogatories (which had not yet been filed) could not lead to the discovery of relevant evidence creating a material issue of fact.
 
 
 8
 It is, of course, well settled that a district court may not resolve issues of fact on a motion for summary judgment.[7] Nor should such a judgment be entered until the party opposing the motion has had a fair opportunity to conduct such discovery as may be necessary to meet the factual basis for the motion.[8] It is especially important to observe these procedural requirements when evidence of motivation is of critical importance.[9] To the extent, therefore, that the district court's decision is predicated on a rejection of plaintiffs' version of the facts, it plainly cannot stand.
 
 
 9
 We, of course, do not decide that plaintiffs' version of the facts is the correct one. But since there has been no trial, in order to test the legal sufficiency of their claims, we must assume that they can prove their case. Thus, our analysis of the law assumes that plaintiffs were performing their jobs competently, that they have no responsibility for determining policy, that they were discharged simply because they are Democrats, and that, in at least some instances, they were offered continued employment if they would actively support the Republican Party.
 
 
 10
 The legal issue which is therefore presented is whether a non-policy making employee, such as a janitor or a driver's license examiner, may be discharged for refusing to transfer his political allegiance from one political party to another.
 
 II.
 
 11
 There are three objections to our consideration of this issue which should first be frankly identified. It is urged (1) that the issue is "political" and therefore unfit for judicial determination; (2) that federal judges may not impose a civil service system on the State of Illinois; and (3) that a tradition of almost 200 years of uninterrupted acceptance of the "patronage system" may not be overcome by judicial fiat.
 
 
 12
 1. This controversy between the plaintiffs and their former employer does not present the kind of "political question" that is nonjusticiable.[10]
 
 
 13
 By application of the "political question" doctrine, the Supreme Court has decided that certain kinds of issues are unfit for federal judicial determination. In situations in which the Court recognized the paramount interest in attributing finality to determinations by the political departments of the federal government-as in matters dealing with war, foreign affairs, the preservation of Indian tribal organizations, or rival claims to recognition as the lawful government of a State-the Court has described the issue as a "political question" and therefore nonjusticiable. In those cases the Court has also stressed the absence of judicially manageable standards for resolving the dispute or fashioning appropriate relief.[11]
 
 
 14
 It is well settled that our duty to accord appropriate respect to a state's sovereignty does not require us to accord finality to a decision to dismiss an employee for an impermissible reason, or to a policy of discrimination against members of a particular race, religion, or political faith in the award or withholding of public benefits. Nor is there any lack of judicially manageable standards in cases of this kind. The motivation for the dismissal of state employees was the critical issue in a wide range of cases which the Supreme Court has routinely treated as justiciable. The underlying rationale for the "political question" doctrine plainly has no application to this case.
 
 
 15
 Of course the word "political" may be applied to several facets of this dispute. The plaintiffs may have acquired their jobs for "political" reasons; they seek to vindicate a "political" right; the outcome of the litigation will have "political" consequences; and, perhaps of greatest significance, defendant's alleged employment practices are supported by ancient and respected "political" tradition. But, as Mr. Justice Holmes so aptly stated, an "objection that the subject-matter of the suit is political is little more than a play upon words. Of course the petition concerns political action but it alleges and seeks to recover for private damage. That private damage may be caused by such political action and may be recovered for in a suit at law hardly has been doubted for over two hundred years, . . . ." Nixon v. Herndon, 273 U.S. 536, 540, 47 S.Ct. 446, 71 L.Ed. 759. We are satisfied that the case before us is not within "that class of political controversy which, by the nature of its subject, is unfit for federal judicial action." Baker v. Carr, 369 U.S. at 330, 82 S.Ct. at 771 (Mr. Justice Frankfurter, dissenting).
 
 
 16
 2. Neither this court nor any other may impose a civil service system upon the State of Illinois. The General Assembly has provided an elaborate system regulating the appointment to specified positions solely on the basis of merit and fitness, the grounds for termination of such employment, and the procedures which must be followed in connection with hiring, firing, promotion, and retirement.[12] A federal court has no power to establish any such employment code.
 
 
 17
 However, recognition of plaintiffs' claims will not give every public employee civil service tenure and will not require the state to follow any set procedure or to assume the burden of explaining or proving the grounds for every termination. It is the former employee who has the burden of proving that his discharge was motivated by an impermissible consideration. It is true, of course, that a prima facie case may impose a burden of explanation on the State. But the burden of proof will remain with the plaintiff employee and we must assume that the trier of fact will be able to differentiate between those discharges which are politically motivated and those which are not. There is a clear distinction between the grant of tenure to an employee-a right which cannot be conferred by judicial fiat-and the prohibition of a discharge for a particular impermissible reason. The Supreme Court has plainly identified that distinction on many occasions, most recently in Perry v. Sindermann, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972).
 
 
 18
 Unlike a civil service system, the Fourteenth Amendment to the Constitution does not provide job security, as such, to public employees. If, however, a discharge is motivated by considerations of race, religion, or punishment of constitutionally protected conduct, it is well settled that the State's action is subject to federal judicial review.[13] There is no merit to the argument that recognition of plaintiffs' constitutional claim would be tantamount to foisting a civil service code upon the State.
 
 
 19
 3. Finally, our answer to the constitutional question is not foreclosed by the fact that the "spoils system has been entrenched in American history for almost two hundred years." Alomar v. Dwyer, 447 F.2d 482, 483 (2d Cir. 1971), cert. denied, 404 U.S. 1020, 92 S.Ct. 683, 30 L.Ed.2d 667.[14] For most of that period it was assumed, without serious question or debate, that since a public employee has no constitutional right to his job, there can be no valid constitutional objection to his summary removal. See Bailey v. Richardson, 86 U.S.App.D.C. 248, 182 F.2d 46, 59 (1950), affirmed per curiam by an equally divided Court, 341 U.S. 918, 71 S.Ct. 669, 95 L.Ed. 1352; Adler v. Board of Education, 342 U.S. 485, 72 S.Ct. 380, 96 L.Ed. 517. But as Mr. Justice Marshall so forcefully stated in 1965 when he was a circuit judge, "the theory that public employment which may be denied altogether may be subjected to any conditions, regardless of how unreasonable, has been uniformly rejected." Keyishian v. Board of Regents, 345 F.2d 236, 239 (2d Cir. 1965).[15] The development of constitutional law subsequent to the Supreme Court's unequivocal repudiation of the line of cases ending with Bailey v. Richardson and Adler v. Board of Education is more relevant than the preceding doctrine which is now "universally rejected."[16]
 
 
 20
 We therefore abjure argument founded only on political tradition in the State of Illinois or on notions of policy which may or may not lead to the extension of the civil service system; such arguments are properly the concern of the General Assembly of the State of Illinois. Our concern is with the First Amendment rights of a citizen named Perry whose sovereign offered him a choice between professing allegiance to the Republican Party or surrendering his position as a janitor in the State House.[17] If he can prove that his employment was terminated because he made the wrong choice, has any right protected by the First Amendment been abridged? We think the Supreme Court has answered this question for us in rather plain language.
 
 III.
 
 21
 In 1949 a closely divided Supreme Court upheld a statute prohibiting federal civil service employees from taking an active part in partisan political activities. United Public Workers v. Mitchell, 330 U.S. 75, 67 S.Ct. 556, 91 L.Ed. 754. The dissenting Justices felt that such an abridgment of First Amendment rights could not be justified.[18] The majority, however, concluded that the government's interests in not compromising the quality of public service and in not permitting individual employees to use their public offices to advance partisan causes were sufficient to justify the limitation on their freedom.[19]
 
 
 22
 There was no dispute within the Court over the proposition that the employees' interests in political action were protected by the First Amendment. The Justices' different conclusions stemmed from their different appraisals of the sufficiency of the justification for the restriction. That justification-the desirability of political neutrality in the public service and the avoidance of the use of the power and prestige of government to favor one party or the other-would condemn rather than support the alleged conduct of defendant in this case. Thus, in dicta, the Court unequivocally stated that the Legislature could not require allegiance to a particular political faith as a condition of public employment:
 
 
 23
 "Appellants urge that federal employees are protected by the Bill of Rights and that Congress may not 'enact a regulation providing that no Republican, Jew or Negro shall be appointed to federal office, or that no federal employee shall attend Mass or take any active part in missionary work.' None would deny such limitations on Congressional power but, because there are some limitations it does not follow that a prohibition against acting as ward leader or worker at the polls is invalid." 330 U.S. 75, 100, 67 S.Ct. 556, 570.
 
 
 24
 In 1952 the Court quoted that dicta in support of its holding that the State of Oklahoma could not require its employees to profess their loyalty by denying past association with Communists. Wieman v. Updegraff, 344 U.S. 183, 191-192, 73 S.Ct. 215, 97 L.Ed. 216. That decision did not recognize any special right to public employment;[20] rather, it rested on the impact of the requirement on the citizen's First Amendment rights.[21] We think it unlikely that the Supreme Court would consider these plaintiffs' interest in freely associating with members of the Democratic Party less worthy of protection than the Oklahoma employees' interest in associating with Communists or former Communists.[22]
 
 
 25
 *****
 
 
 26
 * * *
 
 
 27
 In 1961 the Court held that a civilian cook could be summarily excluded from a naval gun factory. Cafeteria and Restaurant Workers Union, Local 473, AFLCIO v. McElroy, 367 U.S. 886, 81 S.Ct. 1743, 6 L.Ed.2d 1230. The government's interest in maintaining the security of the military installation outweighed the cook's interest in working at a particular location. Again, however, the Court explicitly assumed that the sovereign could not deny employment for the reason that the citizen was a member of a particular political party or religious faith-"that she could not have been kept out because she was a Democrat or a Methodist." 367 U.S. at 898, 81 S.Ct. at 1750.
 
 
 28
 In 1968 the Court held that "a teacher's exercise of his right to speak on issues of public importance may not furnish the basis for his dismissal from public employment." Pickering v. Board of Education, 391 U.S. 563, 574, 88 S.Ct. 1731, 1738, 20 L.Ed.2d 811. The Court noted that although criminal sanctions "have a somewhat different impact on the exercise of the right to freedom of speech from dismissal from employment, it is apparent that the threat of dismissal from public employment is nonetheless a potent means of inhibiting speech." Ibid. The holding in Pickering was a natural sequel to Mr. Justice Frankfurter's comment in dissent in Shelton v. Tucker that a scheme to terminate the employment of teachers solely because of their membership in unpopular organizations would run afoul of the Fourteenth Amendment. 364 U.S. 479, 496, 81 S.Ct. 247, 5 L.Ed.2d 231.
 
 
 29
 In 1972 the Court reaffirmed the proposition that a nontenured public servant has no constitutional right to public employment, but nevertheless may not be dismissed for exercising his First Amendment rights. Perry v. Sindermann, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972). The Court's explanation of its holding is pertinent here:
 
 
 30
 "For at least a quarter century, this Court has made clear that even though a person has no 'right' to a valuable governmental benefit and even though the government may deny him the benefit for any number of reasons, there are some reasons upon which the government may not act. It may not deny a benefit to a person on a basis that infringes his constitutionally protected interests-especially, his interest in freedom of speech. For if the government could deny a benefit to a person because of his constitutionally protected speech or associations, his exercise of those freedoms would in effect be penalized and inhibited.
 
 
 31
 This would allow the government to 'produce a result which [it] could not command directly.' Speiser v. Randall, 357 U.S. 513, 526, 78 S.Ct. 1332, 1342, 2 L.Ed.2d 1460. Such interference with constitutional rights is impermissible.
 
 
 32
 "We have applied this general principle to denials of tax exemptions, Speiser v. Randall, supra, unemployment benefits, Sherbert v. Verner, 374 U.S. 398, 404-405, 83 S.Ct. 1790, 1794-1795, 10 L.Ed.2d 965, and welfare payments, Shapiro v. Thompson, 394 U.S. 618, 627 n. 6, 89 S.Ct. 1322, 1327, 22 L.Ed.2d 600; Graham v. Richardson, 403 U.S. 365, 374, 91 S.Ct. 1848, 1853, 29 L.Ed.2d 534. But, most often, we have applied the principle to denials of public employment. United Public Workers v. Mitchell, 330 U.S. 75, 100, 67 S.Ct. 556, 569, 91 L.Ed. 754; Wieman v. Updegraff, 344 U.S. 183, 192, 73 S.Ct. 215, 219, 97 L.Ed. 216; Shelton v. Tucker, 364 U.S. 479, 485-486, 81 S.Ct. 247, 250-251, 5 L.Ed.2d 231; Torasco v. Watkins, 367 U.S. 488, 495-496, 81 S.Ct. 1680, 1683-1684, 6 L.Ed.2d 982; Cafeteria and Restaurant Workers, etc. v. McElroy, 367 U.S. 886, 894, 81 S.Ct. 1743, 1748, 6 L.Ed.2d 1230; Cramp v. Board of Public Instruction, 368 U.S. 278, 288, 82 S.Ct. 275, 281, 7 L.Ed.2d 285; Baggett v. Bullitt, 377 U.S. 360, 84 S.Ct. 1316, 12 L.Ed.2d 377; Elfbrandt v. Russell, 384 U.S. 17, 86 S.Ct. 1238, 16 L.Ed.2d 321; Keyishian v. Board of Regents, 385 U.S. 589, 605-606, 87 S.Ct. 675, 684-685, 17 L.Ed.2d 629; Whitehill v. Elkins, 389 U.S. 54, 88 S.Ct. 184, 19 L.Ed.2d 228; United States v. Robel, 389 U.S. 258, 88 S.Ct. 419, 19 L.Ed.2d 508; Pickering v. Board of Education, 391 U.S. 563, 568, 88 S.Ct. 1731, 1734, 20 L.Ed.2d 811. We have applied the principle regardless of the public employee's contractual or other claim to a job. Compare Pickering v. Board of Education, supra, with Shelton v. Tucker, supra."Thus the respondent's lack of a contractual or tenure 'right' to reemployment for the 1969-1970 academic year is immaterial to his free speech claim. . . ." 408 U.S. at 597, 92 S.Ct. at 2698, 33 L.Ed.2d 570.
 
 
 33
 This circuit has given full effect to this principle. In Kiiskila v. Nichols, in his opinion for the court sitting en banc, Chief Judge Swygert explained:
 
 
 34
 "A citizen's right to engage in protected expression or debate is substantially unaffected by the fact that he is also an employee of the government and, as a general rule, he cannot be deprived of his employment merely because he exercises those rights. This is so because dismissal from government employment, like criminal sanctions or damages, may inhibit the propensity of a citizen to exercise his right to freedom of speech and association. Pickering v. Board of Education, supra 391 U.S. at 574, 88 S.Ct. 1731. To protect society's interest in uninhibited and robust debate the first amendment demands that government be prohibited from inhibiting or suppressing speech by indirection through discharge of a government employee when the same objective could not constitutionally be achieved by criminal sanctions or other direct means. United States v. Robel, 389 U.S. 258, 88 S.Ct. 419, 19 L.Ed.2d 508." 433 F.2d 745, 749 (7th Cir. 1970).
 
 
 35
 And more recently Judge Hastings succinctly stated "that public employment may not be conditioned upon the surrender of constitutional rights." Donahue v. Staunton, 471 F.2d 475, p. 480 (7th Cir. 1972). See also Hanover Township Federation of Teachers Local 1954 (AFL-CIO) v. Hanover Community School Corp., 457 F.2d 456, 459-460 (7th Cir. 1972).
 
 
 36
 Accepting the premise, as United Public Workers v. Mitchell, 330 U.S. 75, 67 S.Ct. 556, 91 L.Ed. 754, holds, that state interests may justify some curtailment of the political activities of public employees, it seems perfectly clear that the abject and complete surrender of a citizen's First Amendment rights could never be justified. No state interest could justify a requirement that an employee falsely swear allegiance to an offensive religious or political faith, or a requirement that he actively work for, or speak out in favor of, a political cause he deemed obnoxious. The basic rights of citizenship survive acceptance of public employment.
 
 
 37
 If the conditions attached to public employment merely involve some curtailment-as opposed to abject surrender-of First Amendment rights, interests of the State "if strong enough" may justify the condition.[23] As a procedural matter, the burden of establishing such justification rests upon the defendant. In view of the importance which the Court has consistently attached to the First Amendment rights of the citizenry, that burden is a heavy one. Without such justification, the foregoing cases demonstrate that plaintiffs have alleged an impermissible basis for their discharge. We must therefore consider the matter of justification.
 
 IV.
 
 38
 Three separate justifications have been brought to our attention: (1) plaintiffs themselves are the beneficiaries of the patronage system and should not be heard to complain of its routine and foreseeable consequences-as the Supreme Court of Pennsylvania stated, those who "live by the political sword must be prepared to die by the political sword." American Federation of State, County and Municipal Employees AFL-CIO v. Shapp, 443 Pa. 527, 280 A.2d 375, 378 (1971); (2) political affiliation may be a relevant and proper qualification for certain positions; and (3) in all events, effective administration of departments of government requires public, like private, executives to have broad latitude in appointing, replacing, and discharging personnel-any rule that provides the nontenured employee with an easily alleged cause of action for wrongful discharge necessarily inhibits that managerial discretion. Each of these three points is substantial and warrants separate consideration.
 
 
 39
 1. The first argument is predicated on factual assumptions not now a matter of record in this case. In essence, it is suggested that each discharged employee accepted his job with knowledge that he would be fired if, and when, the appointing officer was replaced by a member of the opposite political party. If so, perhaps each plaintiff has waived any right to object to the fully anticipated event which has now come to pass.
 
 
 40
 But the factual assumption may or may not be valid. Even if judicial notice of such matters were proper, it would be unreasonable for us to assume that every nontenured public servant was employed on such a purely political basis. In Board of Regents v. Roth, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972), the Supreme Court refused to accord any greater constitutional protection to the non-tenured teacher's prospects of future employment than to such prospects of other public employees. We cannot properly differentiate between teachers and highway maintenance workers, pilots, law clerks, driver's license examiners or janitors on the basis of mere judicial assumptions about the circumstances attending their respective employment. The particular factual basis for a waiver defense may vary as between different plaintiffs and different job classifications, and may, at best, limit the scope of relief rather than foreclosing the claim altogether.[24]
 
 
 41
 The colorful phrasing of the waiver defense by the Pennsylvania Supreme Court suggests that the right which may have been waived is a right to continued public employment. But we have assumed that no such right exists. The right which plaintiffs seek to vindicate is their constitutional right of association protected by the First Amendment. The United States Supreme Court has repeatedly indicated that a waiver of constitutional rights will not lightly be assumed.[25] Accordingly, until a factual basis for a waiver defense is supported by evidence, we may not determine either its sufficiency or its effect. We are satisfied, however, that the possibility that such a defense may be asserted cannot provide the basis for an affirmance of the district court's judgment.
 
 
 42
 2. The second suggested justification will also have different validity for different employees. Plaintiffs properly do not challenge the public executive's right to use political philosophy or affiliation as one criterion in the selection of policy-making officials. Moreover, considerations of personal loyalty, or other factors besides determination of policy, may justify the employment of political associates in certain positions. It is difficult to believe, however, that any such justification would be valid for positions such as janitors, elevator operators or school teachers. Thus, again, justification is a matter of proof, or at least argument, directed at particular kinds of jobs. The possibility of such valid justification for some positions does not afford a basis for dismissing all of plaintiffs' claims without a trial.
 
 
 43
 3. The third possible justification would appear to have the greatest force. It is given concrete factual support by defendant's detailed affidavit and legal support by opinions recognizing that a public employer, like his private counterpart, has a significant interest in effective supervision of his employees. The factual question, however, must await the outcome of the trial since, as we have already noted, plaintiffs have not completed their discovery and have filed affidavits which, if true, tend to undermine the broad position asserted by defendant, or at least to impeach his justification in particular instances.
 
 
 44
 The legal proposition that the State has a strong interest in allowing its executives to exercise broad discretion in the performance of their managerial functions is, of course, well established.[26] The State's interest in avoiding the interference with managerial discretion which may result from litigation brought by dismissed employees would appear especially strong because the number of employees potentially affected by the rule at issue in this case is so large. It is therefore not frivolous to suggest that the State's interest in the efficient administration of its affairs justifies a rule of law which would defeat all claims such as plaintiffs'. However, there are several considerations which, we believe, foreclose such a rule.
 
 
 45
 If a government department is, in fact, managed on a nonpolitical basis, there is little likelihood that litigation alleging that dismissals were politically motivated would seriously hamper the administration of that department. There is always some risk of such litigation, but that risk is inherent in the performance of the work of government. It is now axiomatic "that the state and federal governments, even in the exercise of their internal operations, do not constitutionally have the complete freedom of action enjoyed by a private employer." Cafeteria and Restaurant Workers Union, Local 473, AFL-CIO v. McElroy, 367 U.S. 886, 897-898, 81 S.Ct. 1743, 6 L.Ed.2d 12, 30. The price which a government must pay to protect the constitutional liberties of its employees is some loss of the efficiency enjoyed by private employers; the Supreme Court has repeatedly decided that the value of those individual liberties is well worth the cost.
 
 
 46
 That cost will loom large only if it is assumed that political considerations will motivate a large number of employment decisions. Unquestionably, to the extent that department heads in fact employ or dismiss highway maintenance workers, elevator operators, janitors, and comparable employees on the basis of their political affiliation, they may find it necessary to defend litigation and burdensome to explain their decisions. But to the extent employment decisions are based on political considerations, they involve a factor not normally present in the private sector; the tendency of that factor quite clearly is in the direction of less, rather than more, efficiency.[27] Thus, reflection persuades us that in the long run the State's strong interest in efficient management is at least consistent with, and may well favor, the recognition and protection of the constitutional rights asserted in this case.
 
 
 47
 *****
 
 
 48
 * * *
 
 
 49
 Of greater significance is the fact that as the number of employees affected is increased, the importance of preserving their First Amendment freedoms likewise grows. Indeed, when numbers are considered, it is appropriate not merely to consider the rights of a particular janitor who may have been offered a bribe from the public treasury to obtain his political surrender, but also the impact on the body politic as a whole when the free political choice of millions of public servants is inhibited or manipulated by the selective award of public benefits. While the patronage system is defended in the name of democratic tradition, its paternalistic impact on the political process is actually at war with the deeper traditions of democracy embodied in the First Amendment.
 
 V.
 
 50
 The preceding section of this opinion raises questions about the plaintiffs' apparent assumption that all of their claims have equal merit. Their complaint was filed "on behalf of the entire class of union members employed by the Defendant, as Secretary of State." No doubt the class action would have been proper if plaintiffs' procedural due process claim were still in the case. Whether the district court should now determine that a class action is appropriate, or if so, how the class or classes should be defined, either for discovery or trial purposes, are matters best appraised by the district court in the first instance. Other than identifying the problem, we express no opinion on such matters.
 
 
 51
 Nor do we make any decision about the nature or scope of relief which may be appropriate if one or more of the plaintiffs should prevail. We merely hold that the district court committed error when he entered summary judgment for the defendant. The record does not support a factual finding that no plaintiff was dismissed for an impermissible reason or the legal conclusion that defendant was justified in prescribing active support of the Republican Party as a condition of continued public employment.
 
 
 52
 Plaintiffs are entitled to an opportunity to prove their case. The judgment is reversed and the case is remanded to the district court for further proceedings.
 
 
 53
 CAMPBELL, District Judge (concurring).
 
 
 54
 The scholarly and perceptive exposition of the pertinent case law so ably expressed by Judge Stevens, persuades me to concur in the result reached by our decision. Indeed, I must, for such a result is dictated by the sweeping holding of the Supreme Court in Perry v. Sindermann, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972).[1]
 
 
 55
 Sindermann is arguably distinguishable from this case on its facts; it did not involve a discharged public employee who alleged, as here, that his dismissal was predicated upon his political party affiliation or activities. Rather, the plaintiff there, a state college teacher, claimed that his employment was terminated because of his statements criticizing the college's Board of Regents, purportedly made in the exercise of his First Amendment right of free expression. The case was thus similar to prior decisions in the special and delicate area of "academic freedom," such as Keyishian v. Board of Regents, 385 U.S. 589, 87 S.Ct. 675, 17 L.Ed.2d 629[2] and Pickering v. Board of Education, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811, and could have been decided, in my view, within the framework of such precedents. However, the language of Sindermann is not so circumscribed but appears far-reaching and manifestly unequivocal. Thus:
 
 
 56
 "For if the government could deny a benefit to a person because of his constitutionally protected speech or associations, his exercise of those freedoms would in effect be penalized and inhibited. This would allow the government to 'produce a result which [it] could not command directly.' Speiser v. Randall, 375 U.S. 513, 526, 78 S.Ct. 1332, 1342, 2 L.Ed.2d 1460. Such interference with constitutional rights is impermissible." (408 U.S. 597, 92 S.Ct. at 2697.)
 
 
 57
 Sindermann was decided after briefing and argument of the case at bar and, as I have stated above, prompts me to concur in the result reached by Judge Stevens' thoughtful opinion. I am constrained at the same time, however, to candidly express several observations that I believe are highly relevant, if not critical, concerning the import and effect of our ruling.
 
 
 58
 First, it cannot be doubted that our decision stands in sharp and irreconcilable conflict with the decision of the Second Circuit in Alomar v. Dwyer, 447 F.2d 482 (1971), and the decision of the Pennsylvania Supreme Court in American Federation of State, County and Municipal Employees, AFL-CIO v. Shapp, 443 Pa. 527, 280 A.2d 375 (1971). Both of those Courts squarely rejected, as a matter of law, the precise claim made by the plaintiffs here, i. e., that they were discharged from their government jobs because of their allegiance to one political party and refusal to join or support another, and that such discharge violated their First Amendment rights of free association. Both Alomar and Shapp were decided within a year prior to Sindermann. Indeed the Supreme Court without a dissenting voice denied certiorari in Alomar on January 10, 1972, only six months prior to that Court's decision in Sindermann. Alomar v. Dwyer, 404 U.S. 1020, 92 S.Ct. 683, 30 L.Ed.2d 667. Too, discussion or even citation of Alomar or Shapp was conspicuously omitted from the Sindermann opinion (or in the concurring and dissenting opinions).
 
 
 59
 Thus, as matters now stand, the declared law of the Second Circuit and of the State of Pennsylvania is diametrically opposed to the law of this Circuit, as so ably formulated and announced herein.[3]
 
 
 60
 Moreover, it can reasonably be expected that the conflict and attendant confusion will grow and multiply as other courts are called upon to consider the same issue. Indeed, it should be noted that at least two District Judges in this Circuit have recently followed the Alomar and Shapp decisions, and thus have rejected claims that public employees cannot be discharged because of their political party affiliations without violating the First Amendment. In Burns v. Elrod, (No. 71C607, N.D.Ill., May 31, 1972), Judge Bauer dismissed a complaint alleging that the newly elected Democratic Sheriff of Cook County violated the First Amendment by discharging Republican employees who refused to become Democrats. And in Shakman v. Democratic Organization of Cook County, (No. 69 c. 2145, N.D.Ill.1972), Judge Marovitz held, in reliance upon Alomar and Burns, that, "political considerations in public employment are only forbidden where those considerations affect voter-candidate-taxpayer rights and in all other respects patronage employees may be hired or fired based on political affiliation." (Slip Opinion p. 20.)
 
 
 61
 The conflicting and confused state of the law is troubling enough, but I am even more concerned over the impact of today's decision in thrusting the federal courts into the administration and daily operations of state and local governments. It seems to me that the inevitable effect will be to convert the federal courts into "super civil service commissions" for all state and local government employees not covered by state or local civil service laws. Any and all such employees who are discharged can state an actionable claim in the federal district court by simply alleging (as plaintiffs have done here) that the discharge was caused by political party affiliations or activities. The federal courts will then be obliged to conduct full trials on the merits to determine whether the claims are factually well founded, and the resulting decisions will of course be appealable.
 
 
 62
 In this case alone, the number of trials and appeals could total as high as 1,946-the number of employees that the defendant Lewis claims he "found it necessary to discharge" after he became Secretary of State "because of the laxity, inefficiency and confusion prevailing in the Office." And this represents the possible number of trials and appeals arising from but one department of a State's government and one change of administration in that department! Considering that there are thousands of state, county and municipal employees not covered by civil service, and that changes of political administration occur in many departments of state and local government after every election, the volume of potential litigation which could result from our decision truly becomes catastrophic.
 
 
 63
 The scope and complexity of the litigation problems created by our ruling are not lessened by our limiting its applicability to "non-policy making" government personnel. It is simple enough to say that janitors, clerk-typists and elevator operators are "non-policy making" employees, but how far up in the bureaucratic echelon can the distinction be judicially drawn? What about a janitorial supervisor, the director of a stenographic pool, a personnel manager, a deputy assistant division head, a deputy director, or even a secretary to a top-echelon director or department head who may have access to confidential information? As Judge Stevens so aptly states, there may be instances when political affiliation constitutes a proper qualification for public employment, particularly in the selection and appointment of "policy-making" officials. Indeed, no one has challenged the right of an elected official to appoint to such positions and for whatever reasons he deems proper, persons in whose loyalty and competence he has the highest confidence. The difficulty arises in attempting to fashion an appropriate and workable judicial standard for distinguishing between "policy-making" and "non policy-making" positions. In my judgment, the constitution would permit a public official to hire or dismiss on the basis of political association any employee engaged directly or indirectly in the formulation or implementation of the policies of the particular governmental office or agency. A more precise standard is difficult to articulate and thus the true impact of today's decision must necessarily await case by case determination.[4]
 
 
 64
 Another vexing and potentially troublesome problem which emerges from our ruling concerns the practical application of the burden of proof standard. It goes without saying, of course, that the burden belongs to and remains with the dismissed employee. It seems equally clear that since a civil service system may not be judicially imposed upon a state or local government, that a public employer cannot be compelled to explain the reasons for termination. Indeed, the imposition of such a "burden of explanation" would run counter to the precise holding of the Supreme Court in Board of Regents v. Roth, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). Thus, if a public employer desires to stand silent by way of a general denial to the employees' allegations, the employee must demonstrate by the clear and convincing weight of the evidence that his dismissal resulted solely because of his political associations. Such a burden is a heavy one but in my view is necessitated by the limited nature of the right Sindermann compels us to recognize today-i. e., the right to be free from summary dismissal only where the dismisal is based solely upon a reason expressly proscribed by the First Amendment to the Constitution.
 
 
 65
 Therefore, based upon the broad holding of the Supreme Court in Sindermann, I concur.
 
 
 66
 KILEY, Circuit Judge (dissenting).
 
 
 67
 I respectfully dissent.
 
 
 68
 No case decided by this court, and none relied upon by the majority, is a precise precedent for the holding of the majority that plaintiffs'[1] discharges for partisan political reasons were constitutionally "impermissible." The Second Circuit in Alomar v. Dwyer, 447 F.2d 482 (2nd Cir. 1971), holds to the contrary. The majority opinion's disavowal of Alomar is based upon footnote 9 in Board of Regents v. Roth, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972), which the majority thinks laid to rest the "premise" in Bailey v. Richardson, 86 U.S.App.D.C. 248, 182 F.2d 46 (1950), aff'd, per curiam, 341 U.S. 918, 71 S.Ct. 669, 95 L.Ed. 1352 (1950), upon which the court in Alomar relied in deciding that "the sole protection for government employees who have been dismissed for political reasons must be found in civil service statutes or regulations." Alomar, supra 447 F.2d at 483, Judge Campbell's concurrence implies that the Supreme Court has not, at least not yet, indicated any disagreement with the Alomar decision. In my opinion the Alomar court's decision on the First Amendment issue before it is unaffected by what is said in the Supreme Court's footnote 9 in the Roth decision.
 
 
 69
 I am persuaded by the decision in Alomar. In my opinion, the district court, in the case now before us, did not err in deciding as a matter of law that plaintiffs' First Amendment right of "free political association" was not violated by their discharge by the defendant.
 
 
 70
 The majority opinion's asserted "demise" of Bailey in my view has no foundation in the Roth footnote. Justice Stewart's comments in footnote 9, considerations essential to Roth, are directed to the procedural due process decision, not to the First Amendment decision, in Bailey. He broadens the scope of the footnote by quoting Justice Blackmun's remark in Graham v. Richardson, 403 U.S. 365, 374, 91 S.Ct. 1848, 29 L.Ed.2d 534 (1971), that the Supreme Court "now has rejected the concept that constitutional rights turn upon whether a governmental benefit is characterized as a 'right' or as a 'privilege."' In addition to Graham, Justice Stewart cites Shapiro v. Thompson, 394 U.S. 618, 627 n. 6, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969), as an example of an equal protection case where the "right" v. "privilege" doctrine has been rejected; Morrissey v. Brewer, 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972), Bell v. Burson, 402 U.S. 535, 91 S.Ct. 1586, 29 L.Ed.2d 90 (1971), and Goldberg v. Kelly, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970), due process cases supporting the theory of Roth; and Pickering v. Board of Education, 391 U.S. 563, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1968), and Sherbert v. Verner, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963), the cases most germane to this appeal because they involve First Amendment claims.
 
 
 71
 In the two First Amendment cases the Supreme Court circumvented the "right" v. "privilege" theory upon a doctrine described by Professor William Van Alstyne as "The Doctrine of Unconstitutional Conditions." 81 Harv.L.Rev. 1439, 1445-1449. That doctrine in essence forbids the government from imposing conditions on government employment which would require the employee to surrender a right which he would be entitled to exercise as a private citizen. It is the implementation of the doctrine that results in the "rejection" of the "right" v. "privilege" dichotomy where First Amendment issues are involved.
 
 
 72
 The unconstitutional conditions doctrine has what Professor Van Alstyne calls a "basic flaw":
 
 
 73
 The basic flaw in the doctrine is its assumption that the same evil results from attaching certain conditions to government-connected activity as from imposing such conditions on persons not connected with government. In many cases this may be true, but the connection with the government may in certain circumstances make otherwise unreasonable conditions quite reasonable. 81 Harv.L.Rev. at 1448.
 
 
 74
 It is this "flaw" that is implicitly recognized in Bailey's discussion of the First Amendment claim and which is implicitly acknowledged in Alomar. It was the First Amendment decision in Bailey, not the procedural due process decision, which the Second Circuit relied upon in rejecting the claim of Daisy Alomar that she had been discharged in violation of her associational right:
 
 
 75
 "It is next said that the appellant's dismissal impinged upon the rights of free speech and assembly protected by the First Amendment, since the dismissal was premised upon alleged political activity * * * But the plain hard fact is that so far as the Constitution is concerned there is no prohibition against the dismissal of Government employees because of their political beliefs, activities or affiliations." Alomar v. Dwyer, 447 F.2d 482, 483 (2nd Cir. 1971), citing Bailey v. Richardson, 86 U.S.App.D.C. 248, 182 F.2d 46, 59 (1950), aff'd, per curiam, 341 U.S. 918, 71 S.Ct. 669, 95 L.Ed. 1352 (1950).
 
 
 
 *
 Senior District Judge William J. Campbell of the Northern District of Illinois is sitting by designation
 
 
 [1]
 Relying on this circuit's decisions in Roth v. Board of Regents, 446 F.2d 806 (7 Cir. 1971), and Shirck v. Thomas, 447 F.2d 1025 (7 Cir. 1971), plaintiffs also claimed that they could not be discharged without first being afforded the procedural due process rights of prompt notice and hearing. After oral argument we entered a hold order because the Supreme Court had granted certiorari in Roth. The Supreme Court reversed this circuit in Roth, Board of Regents v. Roth, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972), and vacated our judgment in Shirck, Thomas v. Shirck, 408 U.S. 940, 92 S.Ct. 2848, 33 L.Ed.2d 746 (June 29, 1972). The Court held that a non-tenured teacher had no Fourteenth Amendment "liberty" or "property" right to continued employment and was therefore not entitled to a pretermination notice and hearing. The Court said that to have a "property" interest in a benefit a person "must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." 408 U.S. at 577, 92 S.Ct. at 2709. One who takes a "patronage" job may not even have an expectation of keeping it when the appointing officer is replaced, let alone a "legitimate claim of entitlement" to such a job. Roth did indicate that different considerations might apply if a state, in dismissing or refusing to rehire an employee, made charges tending to damage his "good name, reputation, honor or integrity." We assume that the loss of a patronage job would in no sense reflect adversely on the discharged employee's reputation. And here, of course, no charges of misconduct were made-the discharges were made without any reasons being given. It is true that the reasons given by the Secretary in his affidavit might be construed as charging mismanagement, inefficiency and perhaps misconduct. However, the affidavit speaks in general terms and does not accuse any particular individual of dishonesty or lack of integrity. Moreover, charges made only in an effort to defend a lawsuit cannot be used to require a "notice and hearing" at a time before such charges were made. The hearing on any such charges is afforded by the judicial proceeding which provoked them. Thus, the Supreme Court's opinion in Roth requires that we reject the "notice and hearing" aspect of plaintiffs' claim
 
 
 [2]
 Specific examples of such conditions cited in the affidavit were:
 "(a) There was no effective internal auditing system or procedure in effect to maintain efficient accounting, financial record-keeping or fiscal control.
 "(b) There was no master or central filing system to assure safe custody, control or awareness of contracts, leases and other important documents.
 "(c) There were no effective controls over purchasing procedures of the office and many purchases were being made by the office in a shockingly loose manner. There was no limitation of the authority of employees to sign orders for and receive services, supplies, transportation or repairs. As a consequence there was no effective control of these matters and it was impossible to determine whether the services and supplies so ordered and received were useful or necessary in the operation of the department.
 "(d) The section of the office in charge of auditing of truck license plate reciprocity and pro-rating was grossly mismanaged in that the laws were not being enforced and truck license fees were not being collected impartially or diligently.
 "(e) Much mail addressed to the office by members of the public had been unanswered and ignored.
 "(f) Many of the public's applications for vehicle licenses had been lost or misplaced.
 "(g) Vendors were selling their products in State buildings without written contracts."
 
 
 [3]
 The interrogatories sought the names and addresses of all persons hired or discharged by defendant after being sworn in as Secretary of State and the job titles and locations of the employment of all employees whom he had discharged
 
 
 [4]
 "My job was to bail papper & keek [sic] the dock clean . . . [M]y supervisor told me I was doing a good job-February 4, 1971 . . . I was a registered member of the Democratic Party in Madison County. I was approached by my supervisor, Mr. Reed, that if I joined the Republic Party, I would be able to keep my job. February 4, 1971. I was terminated from my job on the 5 day of March, 1971. They gave me no reason why I was being let out." A. 396-397
 
 
 [5]
 A. 409
 
 
 [6]
 A. 454
 
 
 [7]
 Sartor v. Arkansas Natural Gas Corp., 321 U.S. 620, 627, 64 S.Ct. 724, 88 L.Ed. 967. The five affidavits specifically reciting that the employees were requested to change their affiliation to the Republican Party are sufficient, in our opinion, to create a genuine issue of material fact. The district court might have considered the issue "immaterial" on the theory that plaintiffs would have no claim even if they had been discharged for "political" reasons. Since we reject that theory, summary judgment was inappropriate
 
 
 [8]
 Rule 56, Fed.R.Civ.P., clearly contemplates that interrogatory answers may be considered on a motion for summary judgment. If discovery is needed to permit the opponent of a summary judgment motion to gather sufficient information to raise a material issue of fact, elementary fairness requires that he have an opportunity to pursue that discovery. In Bane v. Spencer, 393 F.2d 108 (5th Cir. 1968), cert. denied, 400 U.S. 866, 91 S.Ct. 108, 27 L.Ed.2d 105, the court said:
 "Furthermore, it should be fundamental that a defendant who has failed to answer relevant and timely interrogatories is, at least normally, in no position to obtain summary judgment." Id. at 109.
 In ordering a remand to afford the losing party on summary judgment an opportunity for discovery on a material issue, the District of Columbia Circuit has said:
 "This holding in no way supports the view that a mere request for answers to interrogatories will operate to bar the trial court from acting on a motion for summary judgment. It is incumbent upon the party seeking answers to demonstrate that his inquiry is directed toward establishing the 'material facts' and that upon receipt of those answers he will be armed to defend against that motion. This holding does not support harassment tactics or requests for information that is equally accessible to both parties. We simply decide this case on its facts as applied to our reading of Rule 56(c)." Washington v. Cameron, 133 U.S.App.D.C. 391, 411 F.2d 705, 711 (1969).
 Similarly here, we simply decide that these interrogatories should have been answered before the court ruled on the summary judgment motion.
 
 
 [9]
 "We look at the record on summary judgment in the light most favorable to Poller, the party opposing the motion, and conclude here that it should not have been granted. We believe that summary procedures should be used sparingly in complex antitrust litigation where motive and intent play leading roles, the proof is largely in the hands of the alleged conspirators, and hostile witnesses thicken the plot." Poller v. Columbia Broadcasting System, Inc., 368 U.S. 464, 473, 82 S.Ct. 486, 7 L.Ed.2d 458
 See also White Motor Co. v. United States, 372 U.S. 253, 259, 83 S.Ct. 696, 9 L.Ed.2d 738; Williams v. Allen, 439 F.2d 1398, 1401 (5th Cir. 1971).
 
 
 [10]
 The scope of the "political question" doctrine is exhaustively reviewed both in Mr. Justice Brennan's opinion for the Court and in Mr. Justice Frankfurter's famous dissent in Baker v. Carr, 369 U.S. 186, 208-237, 280-301, 330, 82 S.Ct. 691, 7 L.Ed.2d 663
 
 
 [11]
 Summarizing its review of the principal political question cases in Baker v. Carr, the Court stated:
 "We come, finally, to the ultimate inquiry whether our precedents as to what constitutes a nonjusticiable 'political question' bring the case before us under the umbrella of that doctrine. A natural beginning is to note whether any of the common characteristics which we have been able to identify and label descriptively are present. We find none: The question here is the consistency of state action with the Federal Constitution. We have no question decided, or to be decided, by a political branch of government coequal with this Court. Nor do we risk embarrassment of our government abroad, or grave disturbance at home if we take issue with Tennessee as to the constitutionality of her action here challenged. Nor need the appellants, in order to succeed in this action, ask the Court to enter upon policy determinations for which judicially manageable standards are lacking." 369 U.S. 186, 226, 82 S.Ct. 691, 715.
 
 
 [12]
 See, e. g., the Illinois Personnel Code, 127 Smith-Hurd Ill.Stat.Anno. Sec. 63b101-Sec. 63b119
 
 
 [13]
 In Board of Regents v. Roth, discussed in note 1, supra, the Supreme Court concluded that a non-tenured teacher had no "liberty" or "property" interest in his job and was therefore not entitled to a "due process" hearing before being denied a contract renewal. But on the same day the Court recognized that, completely independent of a protected interest in the job, a teacher had a First Amendment right-an aspect of "liberty" in the Fourteenth Amendment-which could not be abridged by the imposition of a penalty of job forfeiture for its exercise. Perry v. Sindermann, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972)
 
 
 [14]
 It may be correct that the patronage system has been followed for "almost two hundred years" and therefore was in existence when the Constitution was adopted. However, the notoriety of the practice in the administration of Andrew Jackson in 1828 implies that it was not prevalent theretofore; we are not aware of any discussion of the practice during the drafting of the Constitution or the First Amendment. In any event, if the age of a pernicious practice were a sufficient reason for its continued acceptance, the constitutional attack on racial discrimination would, of course, have been doomed to failure. See Cousins v. City Council of the City of Chicago, 466 F.2d 830 at p. 847 (1972) (dissenting opinion)
 
 
 [15]
 Quoted with approval in Keyishian v. Board of Regents, 385 U.S. 589, 605-606, 87 S.Ct. 675, 17 L.Ed.2d 629
 
 
 [16]
 Defendant relies heavily on the holding of the Court of Appeals for the District of Columbia in Bailey v. Richardson:
 "It is next said that appellant's dismissal impinged upon the rights of free speech and assembly protected by the First Amendment, since the dismissal was premised upon alleged political activity. * * * But the plain hard fact is that so far as the Constitution is concerned there is no prohibition against the dismissal of Government employee because of their political beliefs, activities or affiliations." 182 F.2d 46, 59.
 The invalidity of the premise underlying that holding was described by the Supreme Court only a few weeks ago:
 "In a leading case decided many years ago, the Court of Appeals for the District of Columbia Circuit held that public employment in general was a 'privilege,' not a 'right,' and that procedural due process guarantees therefore were inapplicable. Bailey v. Richardson, 182 F.2d 46, aff'd by an equally divided Court, 341 U.S. 918, 71 S.Ct. 669, 95 L.Ed. 1352. The basis of this holding has been thoroughly undermined in the ensuing years. For, as Mr. Justice Blackmun wrote for the Court only last year, 'this Court now has rejected the concept that constitutional rights turn upon whether a governmental benefit is characterized as a 'right' or as a 'privilege.' Graham v. Richardson, 403 U.S. 365, 374, 91 S.Ct. 1848, 1853, 29 L.Ed.2d 534; See, e. g., Morrissey v. Brewer, 408 U.S. 471, -, 92 S.Ct. 2593, 33 L.Ed.2d 484; Bell v. Burson, 402 U.S. 535, 539, 91 S.Ct. 1586, 1589, 29 L.Ed.2d 90; Goldberg v. Kelly, 397 U.S. 254, 262, 90 S.Ct. 1011, 1017, 25 L.Ed.2d 287; Shapiro v. Thompson, 394 U.S. 618, 627 n. 6, 89 S.Ct. 1322, 1329, 22 L.Ed.2d 600; Pickering v. Board of Education, 391 U.S. 563, 568, 88 S.Ct. 1731, 1734, 20 L.Ed.2d 811; Sherbert v. Verner, 374 U.S. 398, 404, 83 S.Ct. 1790, 1794, 10 L.Ed.2d 965." Board of Regents v. Roth, 408 U.S. 564, n. 9, 92 S.Ct. 2701, 33 L.Ed.2d 548.
 The significance of the demise of Bailey v. Richardson is especially noteworthy in view of the Second Circuit's reliance, in its per curiam opinion in Alomar v. Dwyer, 447 F.2d 482, 483 (2nd Cir. 1971), cert. denied, 404 U.S. 1020, 92 S.Ct. 683, 30 L.Ed.2d 667, on the same language from the Bailey opinion that defendant has quoted to us.
 
 
 [17]
 For purposes of decision we accept defendant's argument that Shakman v. Democratic Organization of Cook County, 435 F.2d 267 (7th Cir. 1970), cert. denied, Democratic Organization of Cook County v. Shakman, 402 U.S. 909, 91 S.Ct. 1383, 28 L.Ed.2d 650, is not controlling because the plaintiffs' allegations do not indicate-and the defendant's affidavit denies-that defendant's employment practices were so widespread as to disadvantage candidates and voters who attempted to use the electoral process to change the direction of government. Id. at 270. The holding of Shakman is, however, in complete accord with our decision here
 
 
 [18]
 In dissent, Mr. Justice Black stated:
 "To punish millions of employees and to deprive the nation of their contribution to public affairs, in order to remove temptation from a proportionately small number of public officials, seems at the least to be a novel method of suppressing what is thought to be an evil practice.
 "Our political system, different from many others, rests on the foundation of a belief in rule by the people-not some, but all the people. Education has been fostered better to fit people for self-expression and good citizenship. In a country whose people elect their leaders and decide great public issues, the voice of none should be suppressed-at least such is the assumption of the First Amendment. That Amendment, unless I misunderstand its meaning, includes a command that the Government must, in order to promote its own interest, leave the people at liberty to speak their own thoughts about government, advocate their own favored governmental causes, and work for their own political candidates and parties." 330 U.S. at 114, 67 S.Ct. at 577.
 
 
 [19]
 330 U.S. at 94-100, 67 S.Ct. 556
 
 
 [20]
 Referring to a portion of the opinion in Adler v. Board of Education, 342 U.S. 485, 492, 72 S.Ct. 380, 96 L.Ed. 517, the Court said:
 "To draw from this language the facile generalization that there is no constitutionally protected right to public employment is to obscure the issue." 344 U.S. at 191, 73 S.Ct. at 219.
 And on the next page the Court said:
 "We need not pause to consider whether an abstract right to public employment exists."
 
 
 [21]
 In his concurring opinion Mr. Justiee Black equated ineligibility for public employment with punishment. He wrote:
 "Test oaths are notorious tools of tyranny. When used to shackle the mind they are, or at least they should be, unspeakably odious to a free people.
 "It seems self-evident that all speech criticizing government rulers and challenging current beliefs may be dangerous to the status quo. With full knowledge of this danger the Framers rested our First Amendment on the premise that the slightest suppression of thought, speech, press, or public assembly is still more dangerous. This means that individuals are guaranteed an undiluted and unequivocal right to express themselves on questions of current public interest. It means that Americans discuss such questions as of right and not on sufferance of legislatures, courts or any other governmental agencies." 344 U.S. at 193-194, 73 S.Ct. at 220.
 
 
 [22]
 In United States v. Robel, 389 U.S. 258, 88 S.Ct. 419, 19 L.Ed.2d 508, the Court again afforded protection to the First Amendment rights of association of a member of the Communist Party. The Court unequivocally reaffirmed the proposition "that the right of association is specifically protected by the First Amendment." 389 U.S. at 263, 88 S.Ct. at 423
 
 
 [23]
 In his opinion in Donahue v. Staunton, Judge Hastings noted:
 "Interests of the State which, if strong enough, the Court in Pickering felt might lead to a different result in the future are: (1) maintaining discipline or harmony among co-workers; (2) need for confidentiality; (3) employee's position may be such that his false accusations may be hard to counter because of the employee's presumed greater access to the real facts; (4) statements which impede the employee's proper performance of his daily duties; (5) statements so without foundation as to call into question his competency to perform the job; and (6) a close and personal working relationship between the employee and supervisor which called for personal loyalty and confidence." 471 F.2d at 481.
 Chief Judge Swygert, in dissent stated:
 "Pickering v. Board of Education, 391 U.S. 563, [88 S.Ct. 1731, 20 L.Ed.2d 811] (1968), does not wipe out all curtailment of a public employee's right to speak. '[I]t cannot be gainsaid that the State has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general.' 391 U.S. at 568, 88 S.Ct. at 1734. The Court went on to explain that a balance of competing interests must be struck. 'The problem in any case is to arrive at a balance between the interests of the . . . [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.' Id. at 568, 88 S.Ct. at 1734.
 "I read Pickering to hold that if the functions of a public entity are substantially impeded by an employee's statements relating to those functions, measures may be taken to regulate such speech even to the point of terminating employment. If that reading is correct, then the following view expressed by the Eighth Circuit in Jenson v. Olson, 353 F.2d 825 (8th Cir. 1965), even though predating Pickering, has continuing vitality: 'When his . . . [the employee's] speech is disruptive of the proper functioning of the public's business the privilege of governmental employment may be withdrawn without it being said that he was denied his freedom of speech. To hold otherwise would enable governmental employees to practice the rankest form of insubordination and safely hide behind the right of free speech."' 471 F.2d at 484.
 
 
 [24]
 In an entirely different context we have recently noticed that waiver, unlike the defense of estoppel, may merely foreclose the recovery of past damages. Continental Coatings Corp. v. Metco. Inc., 464 F.2d 1375 (7th Cir. 1972)
 
 
 [25]
 It is, of course, well settled that "'courts indulge every reasonable presumption against waiver' of fundamental constitutional rights and that we 'do not presume acquiescence in the loss of fundamental rights.' A waiver is ordinarily an intentional relinquishment or abandonment of a known right or privilege." Johnson v. Zerbst, 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461, quoting from Aetna Ins. Co. v. Kennedy, 301 U.S. 389, 393, 57 S.Ct. 809, 81 L.Ed. 1177; Hodges v. Easton, 106 U.S. 408, 412, 1 S.Ct. 307, 27 L.Ed. 169, and Ohio Bell Telephone Co. v. Public Utilities Comm., 301 U.S. 292, 307, 57 S.Ct. 724, 81 L.Ed. 1093. See Smith v. United States, 337 U.S. 137, 150 and n. 11, 69 S.Ct. 1000, 93 L.Ed. 1264; Carnley v. Cochran, 369 U.S. 506, 514, 82 S.Ct. 884, 8 L.Ed.2d 70; Brookhart v. Janis, 384 U.S. 1, 4, 86 S.Ct. 1245, 16 L.Ed.2d 314; Illinois v. Allen, 397 U.S. 337, 343, 90 S.Ct. 1057, 25 L.Ed.2d 353. See also Stevens v. Marks, 383 U.S. 234, 243-244, 86 S.Ct. 788, 15 L.Ed.2d 724:
 "Even were we to assume, without deciding, that a State may constitutionally exact, on pain of loss of employment and in the absence of counsel, the waiver of a constitutional right, we would be unable to find any justification for denying the right to withdraw it."
 But cf. Mr. Justice Harlan's separate opinion, id. at 246, 248, 86 S.Ct. at 788, 793.
 
 
 [26]
 See note 23, supra
 
 
 [27]
 The courts which have upheld the patronage system have assumed as a matter of policy that it wreaks "a devastating effect . . . upon the orderly administration of government." See Alomar v. Dwyer, 447 F.2d 482, 483 (2d Cir. 1971), cert. denied, 404 U.S. 1020, 92 S.Ct. 683, 20 L.Ed.2d 667. Similarly, the majority of the Supreme Court of Pennsylvania acknowledged regret at finding it necessary to sustain the patronage system in that State. See American Federation of State, County and Municipal Employees v. Shapp, 443 Pa. 527, 280 A.2d 375, 378. The Supreme Court's comment in Ex parte Curtis about a requirement that a public employee contribute private funds to a political campaign would apply equally to a requirement that he contribute services:
 "A feeling of independence under the law conduces to faithful public service, and nothing tends more to take away this feeling than a dread of dismissal. If contributions from those in public employment may be solicited by others in official authority, it is easy to see that what begins as a request may end as a demand, and that a failure to meet the demand may be treated by those having the power of removal as a breach of some supposed duty, growing out of the political relations of the parties. Contributions secured under such circumstances will quite as likely be made to avoid the consequences of the personal displeasure of a superior, as to promote the political views of the contributor-to avoid a discharge from service, not to exercise a political privilege.
 If persons in public employ may be called on by those in authority to contribute from their personal income to the expenses of political campaigns, and a refusal may lead to putting good men out of the service, liberal payments may be made the ground for keeping poor ones in. So, too, if a part of the compensation received for public services must be contributed for political purposes, it is easy to see that an increase of compensation may be required to provide the means to make the contribution, and that in this way the government itself may be made to furnish indirectly the money to defray the expenses of keeping the political party in power that happens to have for the time being the control of the public patronage." 106 U.S. 371, 373-375, 1 S.Ct. 381, 384, 27 L.Ed. 232.
 See also United Public Workers v. Mitchell, 330 U.S. 75, 121-123, 67 S.Ct. 556, 91 L.Ed. 754 (Mr. Justice Douglas dissenting in part).
 
 
 [1]
 Although my remarks are confined to the First Amendment aspects of today's ruling, I agree fully with Judge Stevens that the Supreme Court's decision in Board of Regents v. Roth, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972) forecloses the plaintiffs' Fourteenth Amendment claim that they were entitled to "notice" and a "hearing" before their employment could be terminated
 
 
 [2]
 The Court held in Keyishian:
 "Our Nation is deeply committed to safeguarding academic freedom, which is of transcendent value to all of us and not merely to the teachers concerned. That freedom is therefore a special concern of the First Amendment, which does not tolerate laws that cast a pall of orthodoxy over the classroom." 385 U.S. at 603, 87 S.Ct. at 683.
 
 
 [3]
 In accord with Alomar and Shapp, and also in conflict with our decision, is the holding of the Eighth Circuit in Norton v. Blaylock, 409 F.2d 772 (1969), affirming the decision of the Western District of Arkansas, 285 F.Supp. 659 (1968)
 
 
 [4]
 In addition to the inherent difficulty of defining the term, "non-policy making employee", another problem comes to the surface that is equally perplexing and is of constitutional dimension. If we must judge whether or not an employee may be discharged for exercising his First Amendment rights of free political association on the basis of his job classification, are we not saying that some employments are entitled to greater constitutional protection than others. Are the constitutional rights of an individual to be defined solely with reference to the nature of his employment? I know of no precedent in our system for imposing a "sliding scale" of importance upon the constitutional rights of individuals according to their rank, title, job description or duties, whether in or out of government
 
 
 [1]
 Plaintiffs were non-civil service employees specifically exempt from the Illinois Personnel Code. See Sm.Hurd Ann.Stat. ch. 127, Sec. 63b104c(2) (Cum.Supp.1972)