**INDIANA STATE EMPLOYEES ASSO-
CIATION, INC., an Indiana not-for-
profit corporation, et al.**

v.

**Harold NEGLEY, Individually and as
State Superintendent-elect of Public
Instruction.**

No. IP 73–C–21.

United States District Court,
S. D. Indiana,
Indianapolis Division.

Oct. 24, 1973.

Ronald E. Elberger and Donald R. Anderson, of Bose, McKinney & Evans, Indianapolis, Ind., for plaintiffs.

Theodore Sendak, Atty. Gen., by Richard Johnson, Sheldon Breskow and Robert S. Spear, Deputy Attys. Gen., for defendants.

## JUDGMENT AND MEMORANDUM OPINION

NOLAND, District Judge.

██ This cause came before the Court for trial without a jury on July 9, 1973. Plaintiffs, the Indiana State Employees Association,[1] seven former employees and one current employee of the Indiana Department of Public Instruction, have brought this action for injunction, declaratory relief, and damages for the purpose of challenging their discharge from employment with the Department, purportedly motivated or threatened on the basis of their political party affiliation. It is asserted that the discharge of these employees for such reason is or would be violative of their rights to freedom of association, equal protection, and due process as secured to them by the First and Fourteenth Amendments to the United States Constitution and by Article 1, Sections 9, 12 and 23 of the Constitution of the State of Indiana.[2]

---

1. The Indiana State Employees Association, Inc., is a labor organization composed of employees of the State of Indiana, including the individual plaintiffs herein, organized under Indiana law as a not-for-profit corporation.

2. The Court notes that the discharge of the plaintiffs is not of such nature as to bestow a badge of disloyalty or infamy upon them. Thus there is no foreclosure from other employment which would give rise to a due process violation. Cafeteria & Rest. Wkrs. U. Local 473 v. McElroy, 367 U.S. 886, 898, 81 S.Ct. 1743, 6 L.Ed.2d 1230 (1961); Wieman v. Updegraff, 344 U.S. 183, 190–91, 73 S.Ct. 215, 97 L.Ed. 216 (1952).

The Court, after consideration of the entire record, including the testimony,[3] exhibits, and memoranda of counsel, concludes that no constitutional rights of the plaintiffs herein have been infringed by their discharge from public employment with the State of Indiana.

Defendant Dr. Harold Negley, a Republican, was elected Superintendent of Public Instruction in November 1972 over the incumbent Democrat, John J. Loughlin. Continuity during the change in administration was provided by Dr. Negley's appointment as an Assistant Superintendent in January 1973. On defendant Negley's assumption of office as Superintendent on March 15, 1973, the employment of six of the individual plaintiffs was terminated.[4] Each individual plaintiff is asserted to be either a Democrat or an Independent. None of them were within Indiana's statutory merit system, and each served at the pleasure of the Superintendent of Public Instruction.

Plaintiffs contend that *Illinois State Employees Union, Council 34 v. Lewis*[5] is controlling in the present case. In *Lewis*, a large number of employees of the Illinois Secretary of State's office, "building employees, clerical workers, license examiners and the like,"[6] were summarily dismissed when a Republican was appointed by the Governor to complete the unexpired term of a Democratic Secretary of State who had died in office. The discharged employees brought suit seeking reinstatement. The trial court granted defendant's motion for summary judgment in spite of ninety-four affidavits filed in opposition which all tended to indicate that plaintiffs had been discharged on the basis of their political affiliation. Five of the affiants asserted that they had been requested to change their party affiliation as a condition for continuing in their employment. On appeal, the Court reversed, holding that these five affidavits created a genuine issue of material fact and that the record therefore did "not support a factual finding that no plaintiff was dismissed for an impermissible reason or the legal conclusion that defendant was justified in prescribing active support of the Republican Party as a condition of continued public employment."[7]

Plaintiffs have drawn from *Lewis* the proposition that if the individual plaintiffs' positions were non-policy making ones, they cannot permissibly be discharged from public employment on the basis of their political party affiliation. Assuming initially that plaintiffs have correctly stated the test to be derived from *Lewis*, the facts relative to the duties of each individual plaintiff should be set out as they were developed at trial.

Plaintiffs John J. Day and C. Michael Pitts were employed until March 15, 1973 as Title I Consultants in the Federal Projects Division of the Department at annual salaries of $13,300. Their duties included: (a) processing grant applications from local educational agencies with respect to millions of dollars in federal grant funds awarded on approval of the Department under Title I of the Elementary and Secondary Education Act of 1965;[8] (b) conducting program

3. Pursuant to Rule 65(a)(2) of the Federal Rules of Civil Procedure, all evidence received upon the application for preliminary injunction in this cause, held on March 2 and 8, 1973, reported at 357 F.Supp. 38 (S.D. Ind.1973), became a part of the record at the time of trial.

4. Plaintiff Thomas Abeel's employment did not terminate until June 3, 1973. Plaintiff Jonetta Holland remains an employee of the Department in the position she held on March 15, 1973.

5. 473 F.2d 561 (7th Cir. 1972).

6. Illinois State Employees Union, Council 34 v. Lewis, 473 F.2d 561, 563 (7th Cir. 1972), *cert. denied*, 410 U.S. 928, 93 S.Ct. 1364, 35 L.Ed.2d 590 (1973).

7. *Id.* at 576.

8. 20 U.S.C.A. § 241a. Plaintiffs' exhibits indicate the content of this function. "The Director of Federal Projects is the approving authority for all Title I applications. However, the actual review and approval of

reviews through site visits to local educational agencies;[9] and (c) participating in the drafting of the state plan concerning federal grants.[10] Plaintiff Ross B. Norrick, age 66, was employed until March 15, 1973, as a Title III Consultant in the Federal Projects Division at an annual salary of $13,936. Though his duties pertained to Title III of the National Defense Education Act,[11] they were functionally the same as those performed by plaintiffs Day and Pitts with respect to Title I of the Elementary and Secondary Education Act. Defendant assigned as his reason for discharging plaintiff Norrick his belief that plaintiff Norrick was not effective as a consultant.[12] Defendant Negley testi-

fied that up to the date of the trial he had been of the opinion that plaintiff Norrick was a Republican.[13]

■ Plaintiffs Day, Pitts, and Norrick asserted that they were not policy-making employees.[14] In support of this conclusion, plaintiffs testified that their duties were so completely governed by statutes, regulations, and guidelines that they were allowed no room for discretion. Such a conclusion is hardly credible. Plaintiffs' own exhibits indicate that they were required to exercise an informed discretion in evaluating the merits of applications for millions of dollars in grants sought by numerous and diverse local agencies. Their positions were not rendered non-policy mak-

each application requires the in-put of at least two consultants before final approval." Letter from Richard L. Fairley, Director, Division of Compensatory Education, United States Office of Education to Meredith V. Poer, then Director, Federal Projects Division, Indiana Department of Public Instruction, January 10, 1973, following a program review conducted by the United States Office of Education. Plaintiffs' Exhibit No. 8. While some of the in-put referred to involved filling in blanks on a checklist, the effort included such evaluative functions as determining whether the local agencies' efforts were adequate in providing for the needs of dropouts, handicapped children, non-English speaking children, and children attending non-public schools, whether adequate effort had been made to coordinate Title I grants with programs of other agencies, whether capital outlays had been adequately justified, and whether the stated objectives were appropriate for program goals. Application Review Checklist, Plaintiffs' Exhibit No. 33.

9. Findings of such site visits were recorded in checklist form. The checklist used was drawn up by the consultants, based on their understanding of pertinent United States Department of Health, Education and Welfare regulations and program guides. Included were such evaluative items as determining whether an agencies' Parent Advisory Council was within prescribed guidelines, whether program priorities were consistent with program needs, whether needs assessment was objective, whether the required local agency program evaluation was adequate, and whether the program was meeting its objectives. Title I On-Site Review, Checklist, Plaintiffs' Exhibit No. 34.

10. The Federal Projects Division administers the state plan with respect to federal grants under Title I of the Elementary and Secondary Education Act. The Administrative Handbook 12–9 (August 18, 1972), Plaintiffs' Exhibit No. 3. Referring to this planning function of the consultants, defendant Negley testified that "they not only make decisions after the fact, after all the rules are made in an interpretive fashion; they help make the rules through the writing of the state plan."

11. 20 U.S.C.A. §§ 401, et seq.

12. Defendant Negley testified that in 1968, while serving as an assistant superintendent, he had attended a conference in which the termination of plaintiff Norrick had been considered for failure to spend sufficient time in the field, for reading professional and other magazines at his desk, and for placing too much emphasis on math instruction at the expense of other disciplines.

13. The defendant's testimony in this regard is rendered more credible in view of plaintiff Norrick's testimony that he had never indicated to the defendant or to Ray Slaby, who assisted the defendant in personnel matters, that he was a Democrat.

14. The individual plaintiffs were unanimous in this regard. Plaintiff Pitts stated during the preliminary injunction hearing: "I initiated this litigation, Sir, because I felt that I had been wronged in that I was being terminated from my nonpolicy-making position in the Department of Public Instruction." Transcript at 38. The Court notes that such self-serving conclusions, except with regard to plaintiff Holland, are not borne out by plaintiffs' own exhibits and testimony as to the scope of their duties.

ing by the fact that many of their decisions were subject to formal approval by their superiors. That this approval was generally perfunctory in nature is suggested by defendant Negley's statement that there would have to be something markedly wrong with a consultant's recommendation before his superior would fail to follow it. Therefore, though their decisions were subject to higher review and approval, this does not mask the fact that their cumulative decisions in large part determined the policy of the Department toward, and thus the extent of Indiana's participation in, the Title I and Title III grant programs.

More pertinent to this cause is testimony of defendant Negley that under his administration consultants, in addition to the functions they performed under previous administrations, will be expected to make recommendations as to fund expenditures in specific areas and as to the allocation of available funds. Thus, while Federal Projects consultants were policy making employees under the previous administration, their policy input would appear to be even more pronounced under the current administration.

Plaintiff William E. Wallace was employed until March 15, 1973 as the Title I Coordinator in the Federal Projects Division at an annual salary of $13,900.[15] Within the hierarchy of the Division, his position was functionally that of assistant to the Director. Plaintiff Wallace's duties appear to have been similar to those of the consultants discussed above, though exercised in the form of coordination and review. Defendant

Negley testified that the coordinator participates in making or can make almost the entire recommendation as to the re-allocation of Title I funds between such agencies as the public schools and the Department of Corrections. It appears therefore that he too occupied a policy making position with the Department and that the policy input from that position will be emphasized under the current administration.

The defendant stated that the basis for his decision to discharge plaintiff Wallace was, among several other nonpolitical factors, his reputation for conducting his various personal businesses from his office while employed by the Department. The credibility of his testimony to this effect is bolstered by plaintiff's testimony that he had interests in an apartment rental business, an Amway Products sales business, and a gift shop, and that he used his office telephone with respect to all three of these businesses while employed with the Department.[16]

Plaintiff Marie (Visher) Bonvillain was employed until March 15, 1973, as the Federal Projects Coordinator for the Special Education Division of the Department at an annual salary of $13,390. In that position she served essentially as an assistant to the Director. Her duties included correlating all of the Division's projected activities, processing grant applications, drafting the Division's annual report, and providing advisory assistance to grant applicants. Under the current administration, the person holding that position is additionally required to evaluate the use of federal funds with

---

15. The Court notes that the Personnel Manning Table, Plaintiffs' Exhibit # 1, lists plaintiff Wallace as a Coordinator, though in his testimony he stated that he was a consultant. It appears that plaintiff Wallace may have underestimated his position with the Department. If, however, he was in fact a Title I consultant, then the foregoing treatment of such consultants would apply to him as well.

16. Record at 192. On direct examination plaintiff Wallace testified that he did not

conduct a "major part or major portion" of his apartment rental business from his office, or conduct his Amway Products business from there "to any great extent," and that his activities with respect to the gift shop had not "interfered with" the performance of his duties with the Department. Record at 185. The Court notes that plaintiff Wallace did not testify that these personal businesses did not cumulatively interfere with his conduct of the public's business.

respect to each project, to determine its effectiveness, and assist in determinations of fund utilization between various programs. Therefore, under the administration of Dr. Negley, the holder of plaintiff Bonvillain's position is required to share in the exercise of policy determination with respect to program evaluations and recommendations, allocations and reallocations of funds, and interpretations of various and voluminous rules, regulations and guidelines applicable to the Division's special education programs. It appears then that plaintiff Bonvillain occupied a policy making position previously, and that the policy making element of her successor's duties has been considerably expanded.

Plaintiff Ronald E. Drury was employed until March 15, 1973 as the State Supervisor for Adult Education at an annual salary of $13,390. His duties included approving applications for courses, arranging funding for such courses, traveling throughout the state to review plans for and increase the number of adult education programs. Under the current administration, the new State Supervisor is required to evaluate the local adult educational programs in terms of funds expended, make recommendations as to allocation and re-allocation of funds and interpret voluminous rules and regulations applicable to adult secondary education. Under previous administrations the position has been a policy making one. It is apparent that under the current administration the policy in-put from the State Supervisor will be more strongly emphasized than in the past.

Plaintiff Jonetta C. Holland is employed as a bookkeeper-secretary in the Special Education Division of the Department. On January 10, 1973 she was informed that her services with the Department would not be required after defendant Negley took office. At trial defendant Negley testified that his decision to discharge plaintiff Holland was based on an erroneous assessment of her effectiveness received from Robert Gadberry, a Democrat, Director of the Division of Accounting and Business Management, but that this assessment was changed when questioned by Gilbert Bliton, Director of the Division of Special Education. Defendant Negley stated at the preliminary injunction hearing that he had determined to withdraw his notice, and that defendant Holland could continue working for the Department, a decision that she appears to have accepted. The evidence does not indicate a threat that she will be discharged for political or any other reasons. Therefore, the Court now finds in favor of the defendant as to plaintiff Holland.

Plaintiff Thomas C. Abeel was employed by the Department until June 3, 1973 as the Director of the Neighborhood Youth Corps program at an annual salary of $11,284. It is asserted that plaintiff Abeel occupied a non-policy making position. In view of plaintiff's own exhibits, a contrary conclusion is compelled. It appears that as Director of the program, plaintiff Abeel exercised broad discretion in initiating, implementing and evaluating programs within fund limitations and taking into consideration the varying needs of different geographic areas.[17]

---

17. Like the other discharged plaintiffs, Mr. Abeel has chosen to underestimate the breadth of his duties. In a letter to the Federal Manpower Administration explaining the program contract which he had drafted, plaintiff Abeel stated:

"The second point I would like to expound upon is contract flexibility. I have the feeling that contract formats are dictated more by computers than by men with a clear picture of a social action, anti-poverty program in their minds. Perhaps the nature of the State Department's program is more at odds

with detailed, exact line item figures than are other programs which cover samller [sic] areas; in any case it is necessary for me to *estimate* [emphasis in original] the amount of funds to do the job, work with those limits in setting up the programs taking into account the individual subleties that exist between differing areas.

"The Department of Labor sponsored a one-day workshop here in Indianapolis not too long ago to discuss the 1972–73 In-School program with the sponsors. At that time, it was strongly hinted that the In-School program nation-

The Neighborhood Youth Corps program was federally funded, with the federal government paying $8,463 as its share of plaintiff Abeel's salary.[18] As indicated by *Defendant's Exhibit A* and the identical document included in *Plaintiff's Exhibit No. 45,* the contract under which the program received federal funds amounting to ninety percent of its 1.6 million dollar budget ended on June 3, 1973. Defendant Negley testified that plaintiff Abeel was not the only Department employee whose employment was terminated by the ending of the contract. It is apparent that plaintiff Abeel's termination was dictated by fiscal rather than political considerations. As a result, plaintiff Abeel appears to assert not that political affiliation was the basis for his discharge, but that it should be the basis for his retention.

From this statement of the facts, based upon the more credible and the uncontradicted testimony and exhibits, the conclusion is compelled that the discharged plaintiffs in fact occupied policy making positions with the Department of Public Instruction. Further, it is clear to the Court that the policy making character of these positions is even more pronounced under the current administration. Plaintiffs have asserted that they were so constrained by statute and regulation that they were mere administrative technicians. The Court cannot accept such a theory without necessarily reaching the strange conclusion that defendant Negley is also a non-policy making employee. Clearly, the policies here involved are not those of Congress, the committee which drafted the grant authorizing legislation, the Department of Labor, or the Department of Health, Education and Welfare, but are the local policies of the Indiana Department of Public Instruction. These plaintiffs were not building employees, clerical workers, license examiners and the like. Their positions were highly responsible ones. When local school system administrators sought advice or interpretation from the Department, they contacted these plaintiffs. Plaintiffs planned, sought approval, implemented, supervised and evaluated programs involving the expenditure of millions of dollars of public funds. They performed a portion of the Department's required and discretionary public business. They were in fact a part of that body of officers and employees which constitutes the public face of the Department.

Plaintiffs' reliance on the distinction between policy-making and non-policy-making positions arises from language in *Lewis* wherein the Court stated: "Plaintiffs properly do not challenge the public executive's right to use political philosophy or affiliation as one criterion in the selection of policy-mak-

---

wide was not meeting its goals, that the In-School program nationwide was not providing youngsters with creative work experience jobs, that the program nationwide had somehow gone stale, that the In-School program was more like a yawn between the huge summer programs than it was a meaningful component of its own.

"It was urged at that meeting that more care be taken in developing job sites, that transportation money be more freely used in order to transport kids to the *best* [emphasis in original] job sites if necessary, that more field trips and enriching activities were in order, that more in the way of remedial education, specialized counseling, career education, and creativity was to be encouraged. So, I wrote a contract with all of these goals in mind, a contract that would discourage no one from dreaming of what he could do and then be told that he could not do it because I had not left enough space in a contract for him to try it. I wrote a contract that, from our point of view, attempted to meet the demands of more program quality, of better experience for disadvantaged high-school aged youngsters." Letter from Thomas C. Abeel to Melvin Howard, Associate Regional Administrator, Manpower Administration, United States Department of Labor, September 1, 1972. Plaintiffs' Exhibit No. 45.

Whatever impression this letter had upon the Department of Labor, it conveys to the Court plaintiff Abeel's belief that he was personally charged with the responsibility for shaping and directing a state/federal social action program involving the expenditure of 1.6 million dollars in public funds.

18. *Plaintiffs' Exhibit No. 45.*

ing officials." [19] Such reliance is near-sighted in that it ignores the succeeding sentence in the opinion which states that "Moreover, considerations of personal loyalty, or other factors besides determination of policy, may justify the employment of political associates in certain positions." [20] Though these plaintiffs clearly occupied policy-making positions, the Court foresees that many cases could arise wherein such a distinction could not practically be made. In those cases consideration of "other factors" would be appropriate. If such a distinction must be made, a more useful, and more accurate, one to be drawn from *Lewis* would be the distinction between employees performing or exercising public duties as opposed to those performing merely routine functions not requiring the exercise of an informed discretion or the formulation of underlying rationales for government action.

During their employment with the Department, the plaintiffs herein could have been classified either as policy-making employees or as employees exercising the public functions of the Department. More pertinently, their successors fit even more clearly within these classes. In accordance with the test propounded by the plaintiffs, the Court need not therefore determine whether their dismissals were politically motivated.

The Court concludes, however, that plaintiffs' reliance on *Lewis* is misplaced. *Lewis* was centered on the determination of whether issues of material fact were there present which would render summary judgment inappropriate. In contrast, plaintiffs herein have had full opportunity to resolve the material factual issues in their favor in the course of a two-day hearing on their application for a preliminary injunction and, subsequently, during a three-day trial. Further, while none of the individual plaintiffs herein have claimed that they were requested or required to change their political affiliation, in *Lewis*, of the ninety-four affiants asserting politically motivated discharge, only the five alleging pressure to change political affiliation were found by the court of appeals to present a material issue of fact rendering improper a trial court finding that no plaintiff was dismissed for an impermissible reason. It is apparent that the court of appeals intended to limit *Lewis* to its facts, and that its holding therein is therefore not applicable to the quite different facts of the present case.

The individual plaintiffs assert that the alleged political motivation for their discharge is violative of their right to freedom of association. However, as indicated above, none of the individual plaintiffs have claimed that an attempt was made to change their political affiliation. Their employment status has changed, but, presumably, their political party affiliation or lack thereof remains the same. What plaintiffs are in fact asserting is that discharge from public employment must be politically neutral.

Such an assertion can no longer be answered simply by echoing Justice Holmes [21] to the effect that plaintiffs have no right to public employment. The analysis must be taken a step further. The Court must determine whether the plaintiffs were discharged for an impermissible reason. As the Court stated in *Norton v. Blaylock*,[22]

"It is established by now that a State may not constitutionally impose arbitrary or discriminatory employment criteria and may not in general condition public employment upon the willingness of an employee or would-be employee to forego the exercise of rights protected by some of the first ten amendments to the Constitution as

---

19. 473 F.2d at 574.

20. *Id.*

21. McAuliffe v. City of New Bedford, 155 Mass. 216, 29 N.E. 517 (1892).

22. 285 F.Supp. 659, 662 (W.D.Ark.1968), *aff'd*, 409 F.2d 772 (8th Cir. 1969).

brought forward into the 14th Amendment."

There is not present here (for certainly it is not alleged) the discharge of any plaintiff motivated by racial or religious factors or decided on the basis of sex or to compel plaintiffs to forego the exercise of constitutionally protected rights. A discharge from public employment so motivated would not be constitutionally permissible. However, discharge based on political affiliation, by itself, has not been held constitutionally impermissible, and thus in the absence of controlling civil service or tenure legislation, the Constitution does not provide job security for public employees situated as are the individual plaintiffs herein.[23]

■ To the extent that political patronage has been regarded in both state and federal government as a public evil, it has equally been considered a matter for executive and legislative rather than judicial reform. In Indiana, public employee selection and tenure is largely governed by a complex series of merit statutes and percentage restrictions on patronage appointments. No agency operating under the provisions of the State's Bi-Partisan Personnel System may employ members of a single political party comprising more than sixty percent of its personnel in each pay grade.[24] Separate statutes require certain other state agencies to maintain a fifty percent limitation on employees adherent to any one political party.[25] A number of state agencies and professional employees operate under individual merit statutes. Representative of these are the State Police Department,[26] professional engineers employed by the state,[27] and professional and technical personnel of the Department of Natural Resources.[28] Numerous state agencies operate under the merit provisions of the State Personnel Act.[29]

23. Alomar v. Dwyer, 447 F.2d 482 (2d Cir. 1971), *cert. denied,* 404 U.S. 1020, 92 S.Ct. 683, 30 L.Ed.2d 667 (1972); Bailey v. Richardson, 86 U.S.App.D.C. 248, 182 F.2d 46, 59 (1949), *aff'd,* 341 U.S. 918, 71 S. Ct. 669, 95 L.Ed. 1352 (1951); Gould v. Walker, 356 F.Supp. 421 (N.D.Ill.1973); Shakman v. Democratic Organization of Cook County, 356 F.Supp. 1241, 1245 (N.D. Ill.1972) (dictum); Young v. Coder, 345 F. Supp. 165, 169 (M.D.Pa.1972) (dictum); Moldawsky v. Lindsay, 341 F.Supp. 1393 (S. D.N.Y.1972); Weber v. Highway Commission, 333 F.Supp. 561, 563 (D.Mont.1971) (dictum); Norton v. Blaylock, 285 F.Supp. 659 (W.D.Ark.1968), *aff'd,* 409 F.2d 772 (8th Cir. 1969); American Fed'n of State, County & Municipal Employees v. Shapp, 443 Pa. 527, 280 A.2d 375 (1971); *cf.* Cafeteria & Restaurant Workers Union, Local 473 v. McElroy, 367 U.S. 886, 896, 81 S.Ct. 1743, 6 L.Ed.2d 1230 (1961); Adler v. Board of Education, 342 U.S. 485, 492, 72 S.Ct. 380, 96 L.Ed. 517 (1952); Jenson v. Olson, 353 F.2d 825, 828 (8th Cir. 1965).

24. Ind.Code §§ 4–15–2.5–1 through 4–15–2.-5–22 (1971), Ind.Anno.Stat. §§ 60–1374 through 60–1395 (Burns Supp.1972). Agencies operating under this Act include the State Fire Marshal's office, Department of Insurance, Bureau of Motor Vehicles, Department of Revenue, Department of Natural Resources, and Department of the Adjutant General. The State Highway Commission operates under a separate bi-partisan personnel system, Ind.Code §§ 8–13–1.5–1 through 8–13–1.5–8 (1971), Ind.Anno.Stat. §§ 36–163c through 36–163j (Burns Supp. 1972).

25. Ind.Code § 28–1–2–14 (1971), Ind.Anno. Stat. 18–214 (Burns Supp.1972) applies to examiners employed by the Department of Financial Institutions. Ind.Code § 4–13–5–4 (1971), Ind.Anno.Stat. § 60–118 (Burns Repl.1961) applies to personnel of the Department of Data Processing.

26. Ind.Code §§ 10–1–1–1 through 10–1–1–24 (1971), Ind.Anno.Stat. §§ 47–846 through 47–869 (Burns Repl.1965). The Act additionally imposes a fifty percent limit on the number of employees in each rank adherent to any one political party.

27. Ind.Code §§ 4–15–3–1 through 4–15–3–6 (1971), Ind.Anno.Stat. §§ 60–1351 through 60–1357 (Burns Repl.1961).

28. Ind.Code § 14–3–3–12 (1971), Ind.Anno. Stat. § 60–701f (Burns Supp.1972).

29. Ind.Code §§ 4–15–2–1 through 4–15–2–46 (1971), Ind.Anno.Stat. §§ 60–1301 through 60–1348 (Burns Repl.1961). Among the agencies operating under this Act are numerous state hospital and correctional facilities, the departments of Correction, Labor, Mental Health, Public Welfare, and Civil Defense, the State Board of Health, and

This complex system of merit requirements for state employment and limitations upon political patronage has been enacted by the State Legislature at an accelerating rate beginning with the initial enactment of the State Personnel Act in 1941.[30] The Constitution does not require judicial superimposition upon this statutory scheme of an all inclusive merit or tenure system.[31]

Though only eight of the Department's hundreds of employees have joined this action, it is clear that this could well be a test case through which plaintiffs would have this Court impose an absolute tenure system of public employment upon the State of Indiana. It is clear that plaintiffs are not the only parties whose interests will be affected by the outcome of this action. The public, as the consumer of governmental services, also has an interest to be considered. What is required is a balancing of interests of employees as a part of state government, with the interests of the public at large, in maintaining a governmental instrument responsive to the will of the people as it may be manifested in elections from time to time. If the plaintiffs were asking that the Court by judicial order institute a civil service system similar to the federal system, it would likely be clear that this could not be accomplished. On the other hand, the plaintiffs are requesting an order from this Court wherein the results will be in effect a tenure system

without the benefits of having first imposed merit requirements upon those who seek and hold the position in question.

Many positions of state employment, such as those of the discharged plaintiffs, are exempted from statutory protection in Indiana and other states, because a new administration taking office is only able to carry out its policies by replacing certain officeholders.[32] The newly elected holder of a constitutional office such as that of the Superintendent of Public Instruction, has a strong interest in selecting personnel compatible with his own views as to the performance of the duties of his department. The Superintendent exercises a part of the state's sovereign power. In the proper exercise of his duties, it is essential that he have the opportunity to appoint department personnel in whom he has confidence. It would not be in the interest of good government for this Court to hold that political affiliation cannot be a factor, or in some cases a primary factor, in making personnel determinations. Such a decision would have serious adverse effects upon the conduct of state and local government.

Government employees terminated for budgetary (like plaintiff Abeel) or other non-political reasons would be encouraged to bring actions asserting that their coincidental membership in an "out" political party was the real reason

---

the Indiana Library and Historical Department.

**30.** This trend toward a comprehensive statutory scheme of public employment in Indiana is illustrated by the dates of enactment of the major personnel legislation since 1941.

1945: Merit system created for the State Police Department.

1947: Employment of professional engineers placed on a merit basis.

1961: Department of Data Processing placed under a fifty percent party limitation, Department of Mental Health placed under the State Personnel Act.

1965: Merit system created for employees of the Department of Natural Resources.

1971: Bi-partisan Personnel System created, separate bi-partisan personnel system created for State Highway Commission, examiners of the Department of Financial Institutions placed under a fifty percent party limitation, Department of Corrections placed under the State Personnel Act.

**31.** See cases cited note 23 *supra.*

**32.** Alomar v. Dwyer, 447 F.2d 482, 483–484 (2d Cir. 1971).

for their termination. As Judge Campbell noted in *Lewis:*

"Any and all such employees who are discharged can state an actionable claim in the federal district court by simply alleging (as plaintiffs have done here) that the discharge was caused by political party affiliations or activities.

\* \* \* \* \* \*

"Considering that there are thousands of state, county and municipal employees not covered by civil service, and that changes of political administration occur in many departments of state and local government after every election, the volume of potential litigation which could result from our decision truly becomes catastrophic." [33]

Employees whose employment resulted from political or other considerations unrelated to job competence would be locked into their jobs to the extent that their performance was not so abysmally incompetent as to result in dismissal for cause.

A solidified state bureaucracy would be created which would be impervious to the popular will. Thus the periodically expressed desire of the electorate for sweeping change in the policies, personnel and performance of public administration would be limited in its effect to public employees of the highest echelon.

The Court is aware of the limitations of the patronage system as a means of selecting public employees. It must conclude however, that a judicial decision aimed at abolishing this system, to the extent that it may still exist within the State of Indiana, would invade the functions of the State's legislative and executive branches without serving the cause of improved state government.

The foregoing opinion shall constitute the Court's findings of fact and conclusions of law as required by Rule 52 of the Federal Rules of Civil Procedure.

Accordingly, judgment is now entered in favor of the defendant and against the plaintiffs; plaintiffs' complaint is hereby Dismissed, and costs herein are assessed against the plaintiffs.

---

33. 473 F.2d at 573 (concurring opinion).