**Cecil WREN et al., Plaintiffs,**

**v.**

**Nolan JONES et al., Defendants.**

**No. S–Civ–73–204.**

United States District Court,
S. D. Illinois, S. D.

Aug. 21, 1978.

William S. Hanley, Sorling, Northrup, Hanna, Cullen & Cochran, Springfield, Ill., for plaintiffs.

William J. Scott, Atty. Gen. of Ill., Douglas G. Olson, Asst. Atty. Gen. of Ill., Springfield, Ill., for defendants.

## MEMORANDUM ORDER

J. WALDO ACKERMAN, District Judge.

This action arises out of the separation of twenty-six workers from State employment. The issue of liability has been tried to the Court, sitting without a jury; has been fully and ably briefed by the parties, and is now ripe for decision. This Memorandum Order shall incorporate within its text the necessary findings of fact and conclusions of law pursuant to F.R.Civ.P. 52(a).

Plaintiffs' complaint is based on 42 U.S.C. § 1983. Jurisdiction is based on 28 U.S.C. § 1343. The briefs and arguments of the parties present a great many issues, but those issues can generally be broken down into four basic categories. The first three are distinguished by the constitutional provision alleged to be violated, the first amendment, the due process clause, and the equal protection clause. The fourth area concerns itself with the availability to defendants of certain defenses and arises only upon finding that one of the plaintiffs' constitutional rights were in fact violated. These defenses concern qualified immunity and good faith. Because I find for plaintiffs on the due process and first amendment issues, little discussion of the equal protection questions is required and this opinion will deal primarily with the due process, first amendment and individual liability issues.

## I. Facts

Each of the twenty-six plaintiffs claims to be certified employees within Jurisdiction B (ch. 127, Ill.Rev.Stat. §§ 63b108b et seq.) of the Illinois Personnel Code. Ch. 127, Ill.Rev.Stat. §§ 63b101 et seq. Twenty-five of the twenty-six plaintiffs were employed in maintenance positions in the Illinois Department of Transportation (DOT). The twenty-sixth plaintiff, Claris D. Barger, was employed as a maintenance equipment operator at the Anna State Hospital in the Illinois Department of Mental Health (DMH). Each of the plaintiffs passed the required qualifying exams and successfully completed necessary probationary periods.

On or about June 30, 1973 each of the plaintiffs was separated from State employment by a personnel transaction denominated as a layoff. The reason for the layoff on the official notice received by each plaintiff was as follows:

Layoff occasioned by Judge Verticchio's order in No. 2795–69 in the Circuit Court of Sangamon County.

The case mentioned in the layoff order is *Bradley et al. v. Cellini et al.* (Circuit Court of Sangamon County No. 2795–69). The *Bradley* case was a Mandamus action filed in the Courts of Illinois by former employees who had been discharged in May of 1969, from the Illinois Departments of Transportation and Mental Health.

Illinois Circuit Judge Paul C. Verticchio found that the plaintiffs in that case had been discharged without cause and contrary to the Illinois Personnel Code as well as in violation of the rules of the Department of Personnel.

Judge Verticchio ordered that each of the *Bradley* plaintiffs be restored and returned to the position and title held by them on the date of discharge or in the alternative, that they be discharged in accordance with the Personnel Code and Rules. A writ of Mandamus then issued in aid of the judgment order. The writ was directed to the agency heads involved in the original action, Langhorne Bond, Secretary of Transportation, LeRoy P. Levitt, Director of Mental Health and Nolan B. Jones, Director of Personnel.

Upon receipt of the *Bradley* order, Robert D. Rhoads, Chief Personnel Officer, Field Services Division, Illinois Department of Transportation, contacted Michael Waters, Berwyn Hanley and Robert Boyd, all of the Department of Personnel as well as Brian Hannigan, Assistant to the Secretary of the Department of Transportation, to determine how to comply. This group determined that since no reason to discharge the *Bradley* plaintiffs existed, they would have to be restored to their former position and title. They also determined that a like number of then current employees would have to be laid off. Those persons subsequently laid off are plaintiffs here.

Before reaching the method used to separate plaintiffs from State service, it is necessary to put in historical perspective the positions they held. These positions for many years prior to 1968, were political patronage positions. In November of 1968, Mariam Ringo, Director of Personnel, under the administration of Governor Shapiro, a Democrat, extended Jurisdiction B of the Personnel Code to the positions, removing their patronage character. In February of 1969, however, the Director of Personnel, J. Conrad Vanden Bosch, under the administration of Governor Richard B. Ogilvie, a Republican, ordered that the extension of Jurisdiction B made in 1968, was void and that any act taken under it be expunged. On November 28, 1972, the Director of Personnel, Allen Drazek, under the administration of Governor Ogilvie, once again extended Jurisdiction B to these same positions. At a later time, the Director of Personnel, Nolan B. Jones, under the Democratic administration of Daniel Walker, again sought to make these positions exempt from the provisions of Jurisdiction B. But in a hearing before the Illinois Civil Service Commission, the order of Director Jones was invalidated.

From this history it is apparent that the positions in question were at one time patronage positions and that each successive administration since 1968, has sought to remove the holdover patronage employees from the former administration, place its own patronage people in those positions, and extend Civil Service protection to the new employees.

Both the *Bradley* plaintiffs and the plaintiffs here freely admit that they were originally hired as patronage employees. The *Bradley* plaintiffs were employed sometime prior to December of 1968. Jurisdiction B was extended to them by Director Ringo's order and removed by Director Vanden Bosch's order. The plaintiffs here, were employed after Director Vanden Bosch's order and had Jurisdiction B extended to them by the order of Director Drazek.

In the *Bradley* case, Judge Verticchio ruled that Director Vanden Bosch's order which in effect, invalidated Director Ringo's order, was itself invalid, and required the *Bradley* plaintiffs reinstated or discharged in accordance with the personnel rules.

The original decision of Judge Verticchio was entered on April 9, 1973. The actual manner of implementing Judge Verticchio's order was not, however, considered until approximately June 1, 1973. At that time, it was determined that it was necessary to separate a like number of current employees to make room for the returning *Bradley* plaintiffs. In selecting those persons for separation, the defendant Robert Rhoads, the Field Officer of the Personnel Department made the initial determination that the department should terminate those persons who had actually "viced or replaced" the *Bradley* plaintiffs in 1969.

This intent was carried out in the Department of Transportation by separating 15 of plaintiffs here who were persons who had actually replaced *Bradley* plaintiffs in 1969. Those employees are Caldwell, Brooks, Dickson, Wren, R. Peeler, Lovellette, Casey, Simmons, Betts, Patterson, Potter, Etheridge, Wenzel, Johnson, and W. Peeler. Further, in the Department of Transportation, plaintiffs Kommer, Linder, Holmes, Meinders, Sisk, and Cochran, were replacements for men who had actually replaced the *Bradley* plaintiffs in 1969 and were separated on this basis. Plaintiffs Atkins, Jenkins, Harper, and Mathis were also separated

from the Department of Transportation but had neither replaced a *Bradley* plaintiff nor succeeded a *Bradley* plaintiff replacement.

In the Department of Mental Health, plaintiff Claris Barger was selected for separation on the basis of having the most recent date of hire in the unit.

## II. Due Process

■ Plaintiffs have presented a number of theories bottomed on the due process clause. They argue that defendants violated the due process clause by either, acting arbitrarily and unreasonably in dismissing [1] plaintiffs; by implementing the *Bradley* order to dismiss plaintiffs without plaintiffs being a party to the *Bradley* case; by not giving plaintiffs a pre-dismissal administrative hearing; by denying plaintiffs the protections of the discharge procedures of the Illinois Personnel Code; by failing to give plaintiffs reasonable notice of their dismissal; or by failing to give plaintiffs a plenary hearing, assertedly required under the unique circumstances of their claims. Be that as it may, the heart of the entire litigation is the *Bradley* case and its implementation.

But for the *Bradley* case none of the plaintiffs here would have been laid off and this case would not have arisen. No clarification or modification of the *Bradley* order was sought. Nor was any appeal taken. In fact, the layoff progressed in an uncommonly swift manner. As defendant Shelton said in his memorandum to file, "[a] damned hectic manner in which to do business."

The syllogism used by defendants to conclude that the layoff here was necessary, seems to be that since;

1. Judge Verticchio ordered *Bradley* people put back to work; and since
2. Employees in those units and classifications had earlier been laid off for fiscal reasons;

3. Therefore, an equivalent number of current employees must be laid off; further,
4. Since the current employees all have the same certification date, the most equitable manner to choose between incumbents with the same seniority is to trace, and layoff those who actually viced or replaced the *Bradley* plaintiffs.

The fact that defendants took some actions required by the Court's order in *Bradley* is no defense to any action taken against plaintiffs here. The plaintiffs were not party to the *Bradley* order and not bound in any way by it. Any indication that Judge Verticchio made as to the proper status of the plaintiffs here could have no effect since they were not parties.

The Verticchio order required only the *Bradley* plaintiffs be reinstated or discharged in accord with the personnel rules, nothing more. The responsibility for any actions beyond reinstatement or discharge of the *Bradley* plaintiffs rests with those who took them. The fact that certain consequences flowed from the *Bradley* order provides no defense. In fact, that causal link, provides substantial support for plaintiffs' due process claims.

■ Plaintiffs assert that their rights to due process of law were violated either by not being made party to the *Bradley* decision or alternatively, by implementing the *Bradley* decision as they did without plaintiffs being party to *Bradley*. Defendants respond with a number of Illinois cases cited for the proposition that in a mandamus action for reinstatement, as the *Bradley* case was, the incumbent employee need not be joined unless, the mandamus would *necessarily* adjudicate the employment rights of the incumbent. *See, Cordes v. Isaacs,* 27 Ill.2d 383, 189 N.E.2d 236 (1963) and *People ex rel. Coryell v. Barrett,* 320 Ill.App. 593, 51 N.E.2d 795 (1st Dist. 1943).

1. Plaintiffs have argued throughout, that the layoff was but a subterfuge for discharge and that therefore, they were entitled to the discharge procedures under the Illinois Personnel Code. Because of the holding here, I believe it unnecessary to determine whether the layoff was in fact, a subterfuge for discharge.

This latter case couples neatly with another argument made by defendants, but I believe the argument proves too much. The *Coryell* Court held that where the plaintiff was a civil service employee and the incumbent was not, the incumbent was not a necessary party required to be joined since the incumbent had no legal entitlement to the position and served only at the pleasure of her employer. Defendants have argued that since the *Bradley* plaintiffs were found in the *Bradley* decision to have been improperly discharged, they were *de jure* employees while their replacements were *de facto* employees. As *de facto* employees, defendants argue, plaintiffs could have been terminated at will and thus had an insufficient property right [2] in their positions to invoke the protections of either the due process or equal protection clause.

It is apparent that notions that the plaintiffs here were improperly hired were utilized to select the majority of the plaintiffs for layoff. They were selected on the basis that they had viced or replaced *Bradley* plaintiffs.

I agree that the plaintiffs here were not necessary parties under Illinois law to the *Bradley* court. However, the facts undisclosed to the *Bradley* court, the fact that an equivalent number of current employees would be laid off and that the majority would be chosen on the basis that they had viced or replaced *Bradley* plaintiffs, made the plaintiffs necessary parties both under Illinois law and the due process clause. The rights of all the plaintiffs here were in fact, necessarily affected by decisions and policies unknown to the *Bradley* court.

The problem of reinstatement of employees and its effect on the employees at work prior to the reinstatement is reoccuring, but one to which the courts have spoken somewhat infrequently. In racial discrimination class actions, where the relief sought would alter the seniority of other union members, the union or the affected members have been held as necessary parties. *English v. Seaboard Coast Line Railroad,* 465 F.2d 43 (5th Cir. 1972); *Waters v. Wisconsin Steel Works of International Harvester Co.,* 301 F.Supp. 663 (N.D.Ill.1969). In other cases, notice has been required to be given to affected employees so as to facilitate intervention. *See, e. g., Meadows v. Ford Motor Co.,* 510 F.2d 939, 949 (6th Cir. 1975).

Since there was a direct causal relationship between the *Bradley* order and the layoff of all the plaintiffs here, I believe these plaintiffs had a sufficient stake in the outcome of the *Bradley* litigation to be made parties. Their interests could be adequately protected in no other proceeding. Had Judge Verticchio known of the possible results to the plaintiffs here, known of the results which in fact obtained, he could have ordered the plaintiffs joined, given notice and allowed plaintiffs to intervene or perhaps fashioned other protections for plaintiffs' interests. Such protections could not be formulated, however, because the defendants' actions occurred in response to the *Bradley* order.

Under the unique circumstances of this case, I believe that plaintiffs' rights to due process of law were violated. The defendants' response to the *Bradley* order, and the manner in which *Bradley* was implemented established the plaintiffs here as necessary parties to the *Bradley* litigation. They were not made party and thus were unable to protect the interest they had in their employment. They were denied due process of law.

This conclusion alone justifies the imposition of injunctive relief. But because of the claims for money damages against individual defendants, I believe I must also reach the first amendment issues.

---

2. This property right argument has been expanded to assert that plaintiffs here were also not certified employees within Jurisdiction B of the Personnel Code and thus had but a mere expectancy in retaining their employment insufficient to trigger the protections of either the due process or equal protection clauses. Again, this argument only points up the necessity that plaintiffs be made party in the *Bradley* case. Suffice to say, defendants claim that plaintiffs were treated as certified employees throughout the personnel transactions here at issue and will be so treated here.

## III. First Amendment

Plaintiffs present two issues asserting violations of plaintiffs' rights under the first amendment. First, plaintiffs assert that their separation from State service was in furtherance of a patronage program, thus violating their rights under the first amendment under the rationale stated in the cases of *Elrod et al. v. Burns et al.,* 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976) and *Illinois State Employees Union Council 34 v. Lewis,* 473 F.2d 561 (7th Cir. 1972), *cert. denied* 410 U.S. 928, 93 S.Ct. 1364, 35 L.Ed.2d 590 (1973). Secondly, plaintiffs assert that defendants denied them re-employment opportunities in furtherance of a patronage program and thus violated plaintiffs' first amendment rights.

■ Concerning the burden of proof on these issues, Justice Rehnquist, writing for a unanimous Court in *Mt. Healthy City School District Bd. of Ed: v. Doyle,* 429 U.S. 274 at 287, 97 S.Ct. 568 at 576, 50 L.Ed.2d 471 (1977), said:

Initially, in this case, the burden was properly placed upon respondent to show that his conduct was constitutionally protected, and this conduct was a "substantial factor"—or, to put it in other words, that it was a "motivating factor" [footnote omitted] in the Board's decision not to rehire him. Respondent having carried that burden, however, the District Court should have gone on to determine whether the Board had shown by a preponderance of the evidence that it would have reached the same decision as to respondent's reemployment even in the absence of the protected conduct.

Thus, plaintiffs have the burden of proving that their status as Republicans was a substantial or motivating factor in their separation from State service. Thereafter, the burden shifts to defendants to show by a preponderance of the evidence, that the separation would have occurred in absence of plaintiffs' status.

■ Plaintiffs seek to discharge their burden through a case built almost entirely upon circumstantial evidence and inference. Plaintiffs have not found the "smoking gun" which would establish beyond all question that their status as Republicans was a motivating factor in their separation. Rather, plaintiffs have sought to convince this Court through a totality of the circumstances that their status was a substantial or motivating factor in their separation. They have succeeded.

To begin, it must be remembered that the actions of defendants which plaintiffs argue as raising the inference that plaintiffs' first amendment rights were violated must be viewed against the historical background of the positions. This historical background, alone, raises an inference that the actions taken by defendants here were taken for political reasons. New administrations, both Republican and Democratic, sought to remove holdover patronage workers regardless of protection given their positions by the prior administration, and place their own patronage workers in those jobs. This history, when coupled with the aborted attempt of the defendant Nolan Jones to remove the protections of Jurisdiction B from these particular positions, predisposes one to the idea that the actions taken by defendants here are but one more attempt in a long series of such attempts, to replace holdover patronage employees with new patronage people.

Plaintiffs here were Republican patronage workers appointed under the Ogilvie administration. They were separated from State service under the administration of Daniel Walker, a Democrat. Plaintiffs argue that defendants utilized the *Bradley* order to partially accomplish the ends that the Democratic administration sought to achieve by the attempt to remove Jurisdiction B from the positions entirely. That is, the *Bradley* Order required Democratic patronage workers placed on the State payroll and presented the Democratic administration with the opportunity to terminate a like number of Republican patronage workers. l believe it would be fair to adopt this argument on the basis of the inference that can be drawn of the history of the positions alone. However, plaintiffs have bolstered this inference with a number of actions on

the part of defendants which I believe, establish by a preponderance of the evidence, that plaintiffs' political affiliation was a substantial or motivating factor in the personnel action taken against them.

Chronologically, the defendants' response to the *Bradley* case itself, supports the inference that plaintiffs' status was a substantial factor in their separation from State service. Governor Walker's administration was firmly in control at the time that Judge Verticchio found in favor of the former Democratic patronage workers and ordered their reinstatement. No appeal from this order was taken, no clarification was sought, nor was any modification of the order attempted[3] in spite of the fact that five of the *Bradley* plaintiffs were thought physically incapable of performing their duties and it was recommended that the Attorney General's office be contacted to file a motion seeking relief from the *Bradley* order concerning these individuals. These findings and recommendations are contained in a memorandum from one R. L. McCracken to the defendant Robert Rhoads. There was testimony to the effect that Mr. Rhoads gave the memorandum to the defendant Brian Hannigan and that Hannigan took no action.

Mr. Hannigan's role in plaintiffs' case is important in several other ways. He was employed at the time as defendant Bond's administrative assistant. His function was to serve as Secretary Bond's representative in all matters concerning personnel management in DOT. He was particularly charged with the duty of assuring the Department's compliance with the *Bradley* order. Prior to his joining State government in January of 1973, Hannigan had been campaign coordinator in the 20th Congressional District for the campaign of Dan Walker for Governor. There was testimony to the effect that it was general knowledge that at the time in question, Mr. Hannigan was in charge of patronage at DOT.

Given Mr. Hannigan's political background, it must be remembered that Hannigan was a member of the group who initially determined that the *Bradley* plaintiffs would have to be reinstated and a like number of current employees laid off. Further, there was testimony to the effect that when defendant Rhoads attempted to get approval for the *Wren* plaintiffs to apply for voluntary reductions as authorized under the personnel code, Hannigan told Rhoads that these requests could not be honored.

Apparently voluntary reductions could only be taken to the positions of summer junior laborer. Those positions had a patronage history and remained patronage through the summers of 1973 and 1974. Apparently the process for obtaining these positions began with Hannigan informing Mr. David Cleverdon, the patronage director in the Governor's office, how many jobs were available and Cleverdon's office would in return, give Hannigan the names and addresses of people to whom offers of employment could be made. Those names would then be forwarded from Hannigan's office through the proper chain of command in DOT and the employment offer was made at the district level.

Hannigan's political background and the decisions which he made or which he took part, provide some support for the inference that plaintiffs' status as Republicans was a substantial factor in their separation from State service.

Another major support for plaintiffs' inference is the method used in selecting the plaintiffs here for layoff.[4] While this method of determining who was to be laid off apparently originated with defendant

**3.** To this point in the opinion all the arguments for counsel have been equally applicable to the claims of each individual plaintiff. However, many of the circumstances from which plaintiffs seek to draw inferences are applicable only to happenings in DOT. Plaintiff Claris Barger was at the time of layoff, employed in DMH. His claims will be dealt with separately.

**4.** The method chosen was to trace the persons who had actually replaced *Bradley* plaintiffs on the job. This method has been discussed in Part I, supra, and provides substantial support for the holding in Part II, supra, and will not be discussed in detail here.

Rhoads, there is evidence to the effect that it was done with the approval of a number of the other defendants. Prior layoffs in these same sections of the Department of Transportation had utilized seniority as the sole criteria in determining who was to be laid off, but in this instance the Democratic administration determined that this special method of selection was warranted. This methodology can only be construed as an attempt to return to an earlier time when A, B and C were the Republican maintenance workers and X, Y and Z were the Democratic maintenance workers and each change of administration brought changes in the laborers who worked on the State's highways.

Before terminating the discussion of the manner in which the layoff was accomplished, it is instructive to examine plaintiffs' exhibit 91. That exhibit is a memorandum from defendant Don Shelton, Administrative Manager for District 9, DOT, to his own file, dated June 14, 1973. The memorandum purports to record the final instructions received from defendant Rhoads concerning the layoff. It states that Rhoads received his instructions from "downtown" on the night before. It further records that the letter mailed to the returning *Bradley* plaintiffs contained no provisions for the individual to decline the offer of reinstatement. From this last fact, it can be inferred that defendants intended to lay off a number of current employees equal to the number of *Bradley* plaintiffs without respect to whether those plaintiffs all returned to work or not.

While it is true that the number of employees laid off was equivalent to the number of *Bradley* plaintiffs returning to work and, in fact, one employee scheduled for layoff was not laid off when it was determined that a *Bradley* plaintiff, Frank Davis, was physically unable to return to work, a *Wren* plaintiff was laid off for each *Bradley* plaintiff who in fact reported. This was in spite of the fact that at the time they reported there was some doubt as to whether five of the *Bradley* plaintiffs were physically capable of performing the work, that four of the *Bradley* plaintiffs had not successfully completed the Department's required eye examination, that three were 65 years of age or older, that two took immediate leaves of absence and finally, that one resigned within two weeks of plaintiffs' layoff. In this regard, it should be noted that since the *Bradley* plaintiffs reported for work on June 20, 1973, and the *Wren* plaintiffs were not laid off until June 30, 1973, there is no doubt that defendants had notice, at least of the physical infirmities of the *Bradley* plaintiffs, prior to layoff.

Along this same line, plaintiffs have made a separate issue out of whether they were denied re-employment opportunities as a result of a patronage program in violation of their rights under the first amendment. None of the plaintiffs here, with the exception of Ira Harper, has been reinstated even though all plaintiffs purportedly had re-employment rights for a two-year period following their layoff. *Bradley* plaintiffs, Robertson and Rowe resigned their positions on July 13, 1973, and September 28, 1973, respectively. Howard Casey and Paul Potter, both plaintiffs here, made timely demands for re-employment. These demands were refused. Further, *Bradley* plaintiff John Davis died on November 26, 1973. *Wren* plaintiff Arthur Meinders, who was terminated to make space for Davis, made a similar demand for re-employment, but was also refused.

Defendants answered these particular demands for re-employment with letters stating that due to fiscal restraints those positions would not be filled. It is not the business of this Court to determine how the Illinois Department of Transportation distributes its allocated funds. However, it must be noted that plaintiffs proved that during the period subsequent to plaintiffs' layoff, funding was available for at least five so-called "ghost" employees in the district where plaintiffs were laid off. These employees were persons who, although they were on the payroll, were very rarely seen and whose function was unknown to those working in the district. The conclusion that they were political patronage workers is inescapable.

These facts and circumstances when taken *in toto* establish by preponderance of the evidence, that plaintiffs' political associations were a substantial or motivating factor in their separation from the State service. No one fact or circumstance when taken alone is sufficient to discharge plaintiffs' burden, but when taken together, and when all reasonable inferences are drawn therefrom, I find that plaintiffs have discharged their burden.

Under the *Mt. Healthy* decision then, the burden is shifted to defendants to establish that plaintiffs would have been separated from State service in any event. This burden has not been met.

Although defendants argued well, the bulk of their argument has been directed at obtaining the opposite inference from the facts and circumstances plaintiffs have argued. Their strongest argument is the established fact that all the workers in the affected units were Republicans and that no Democratic patronage workers, other than the *Bradley* plaintiffs, have to this date been hired in those units.[5]

In my opinion this falls short of discharging their burden in at least two ways. First, defendants' evidence does not establish to my satisfaction, that fiscal restraints required the layoff of a number of current employees equivalent to the number of *Bradley* plaintiffs. Secondly, it appears to me to be undisputed that except for the activities of a number of these plaintiffs as the political patronage workers who had replaced the *Bradley* plaintiffs they would not have been chosen or at least might not have been chosen, for layoff.

Under these circumstances I believe that the plaintiffs employed in DOT, must prevail on the first amendment issue and so hold. Since the question of damages has been reserved for later hearing, as to the DOT plaintiffs, only issues as to the liability of individual defendants remain. These issues will be discussed in Part IV of the opinion. But before reaching those issues,

the position of plaintiff Barger must be addressed.

▮ Plaintiff Claris Barger was employed as a maintenance equipment operator at the Anna State Hospital in the Department of Mental Health. He was the only plaintiff here laid off in DMH as a result of the *Bradley* order. In contrast to the DOT plaintiffs, Barger was laid off because although his seniority date was the same as four other workers in his unit, his total time of State service was less.

Judge Verticchio ordered three *Bradley* plaintiffs returned to DMH. One was unable to return because of ill health. Barger and Royal E. Kirkpatrick, not a plaintiff here, were laid off. Their layoffs were effective July 13, 1973. Dr. LeRoy P. Levitt, in his letter to defendant Nolan Jones, Director of the Department of Personnel, stated:

> These layoffs are due to surplus employees in the above classification which was created by court order in case no. 275969 [sic] filed in the Circuit Court of Sangamon County, which returned three former maintenance equipment operators to work on June 21, 1973. One of these employees has since resigned which is the reason two maintenance equipment operators are being laid off rather than three.

As to the first amendment claims asserted, plaintiff Barger can only show that he was a former Republican patronage worker, that he was laid off during a Democratic administration and that he was laid off in order to make room for a former Democratic patronage worker ordered reinstated by the *Bradley* decision. No other facts or circumstances concerning plaintiff Barger have been asserted from which it can be inferred that Barger's layoff was due to his status as a Republican. Under these circumstances, I do not believe plaintiff Barger has discharged his burden. He has not established that the exercise of a right protected under the first amendment was a

---

**5.** There were no "ghost employees" carried on the payrolls of any of plaintiffs' organization units. However, there apparently were such employees on the payroll of the District organization.

substantial or motivating cause for his separation.

After an examination of the other issues presented on behalf of plaintiff Barger, excepting only those discussed in Part II, *supra,* I believe he has failed to establish that any of his rights under the Constitution were violated in his separation from State service. His major argument is that under the circumstances here alleged he was entitled to a pretermination hearing prior to his separation from State service. This, of course, is true if Barger was in fact discharged rather than laid off.

There is no question that were plaintiffs discharged rather than laid off they would be entitled to greater procedural protections. As Justice Underwood, writing for the Illinois Supreme Court, said in *Powell v. Jones*:

> [t]he apparent difference between procedures provided for certified employees in discharges and layoffs is the right to a plenary hearing and to counsel, witnesses, confrontation and cross-examination prior to his discharge for cause. 56 Ill.2d 70, 81, 305 N.E.2d 166, 171 (1973).

Be that as it may, as to the evidence presented on behalf of plaintiff Barger, I cannot say that the layoff was a subterfuge for discharge. Under the analysis in Part II, *supra* I believe Barger has established that his rights to due process were violated. However, judgment must be for defendant on the remainder of plaintiff Barger's claims.

### IV.  Individual Liability

Plaintiffs here seek a mandatory injunction requiring reinstatement, compensatory and punitive damages, as well as attorneys' fees under 42 U.S.C. § 1988. The claims for money damages and attorneys' fees are made against the defendants in their individual capacities. Defendants in turn, respond that they are immune from such damages based on an application of the doctrine of qualified good-faith immunity.

For reasons which will appear more fully below, the injunction shall be granted and punitive damages denied, compensatory damages, and attorneys' fees allowed, but the questions of immunity for some defendants will be reserved.

Originally, Nolan B. Jones, Langhorne Bond, and LeRoy Levitt were named both individually and in their official capacities as Director of the Department of Personnel, Secretary of Department of Transportation, and Director of the Department of Mental Health respectively. Subsequently, the present holders of those offices, William Boys, Director of the Department of Personnel, Robert DeVito, Director of the Department of Mental Health, and John D. Kramer, Secretary of the Department of Transportation, were substituted for Jones, Bond and Levitt in their official capacities. These substituted defendants returned plaintiffs to work under a preliminary order of this Court. That preliminary order is justified under the findings of Part II and Part III of this opinion, and is hereby made permanent.

In response to plaintiffs' claims for compensatory and punitive damages as well as attorneys' fees, defendants have raised the doctrine of qualified immunity based on good-faith. It has been established since *Tenney v. Brandhove*, 341 U.S. 367, 71 S.Ct. 783, 95 L.Ed. 1019 (1951), that under certain circumstances immunity protects governmental officials from liability for damages sought under 42 U.S.C. § 1983, resulting from actions taken in their official capacities. For some governmental officials, for example legislators and judges, that immunity is absolute. *See, Tenney, supra,* at 376, 71 S.Ct. 783 and *Stump v. Sparkman*, 435 U.S. 349, 98 S.Ct. 1099, 55 L.Ed.2d 331 (1978). For others, only a qualified immunity based on good-faith is available. *See, Scheuer v. Rhodes*, 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974).

> It is the existence of reasonable grounds for the belief formed at the time and in light of all the circumstances, coupled with good-faith belief, that affords a basis for qualified immunity of executive officers for acts performed in the course of their official conduct. *Scheuer, supra* at 247–248, 94 S.Ct. at 1692.

In order for this immunity to protect the governmental official, the official must prove that he did not know nor reasonably should have known, that the actions he took would violate the constitutional rights of the plaintiff *and* that he did not take the actions with any malicious intent to cause a deprivation of constitutional rights or other injury to plaintiff. *Wood v. Strickland*, 420 U.S. 308, 322, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975). *See also, Foster v. Zeeko*, 540 F.2d 1310 (7th Cir. 1976); *Hostrop v. Bd. of Jr. College Dist. No. 515*, 523 F.2d 569 (7th Cir. 1975) and *Mims v. Bd. of Education of the City of Chicago*, 523 F.2d 711 (7th Cir. 1975).

Thus, the *Wood* test contains both objective and subjective elements. Defendants must establish the lack of each of these elements in order to be entitled to immunity. Further, I believe that if it can be shown that any defendant acted with malicious intent to cause deprivation of constitutional rights or other injury to any plaintiff, the subjective portion of the *Wood* test, that plaintiff would be entitled to punitive damages.

However, after an examination of the briefs concerning the role of each individual defendant and a review of the testimony of those defendants either taken in open Court or through depositions I believe that defendants have successfully established the lack of any malicious intent. That finding precludes the award of punitive damages against any defendant.

There remains, however, an examination of defendants' actions under the objective portion of the *Wood* test. The question is whether each defendant knew or reasonably should have known, that the actions he took would violate the constitutional rights of any plaintiff.

Plaintiffs' rights have been found to have been violated in two respects. In Part II, I determined that plaintiffs' rights to due process of law were violated through the handling of the *Bradley* decision and its implementation. In Part III of this opinion I have determined that plaintiffs' first amendment rights were violated since plaintiffs' status as Republicans was a substantial or motivating factor in the personnel actions taken.

The part played by any one defendant in the violation of plaintiffs' rights is difficult to ascertain. Counsel for defendant has argued that plaintiffs' claims read like a conspiracy case even though no conspiracy is charged. To a large extent this is true. Each defendant played a role, although at times a fairly minimal role, in the violation of plaintiffs' rights. The burden on defendants at this point is to show that they did not know nor reasonably should have known that their actions violated plaintiffs' rights. Defendants thus have the burden of proving a negative, the lack of knowledge. Because of the small part played in the violation of plaintiffs' rights by a number of the defendants and because plaintiffs' assertion of political motivation has been proven by inference rather than direct evidence, the burden of each individual defendant is almost impossible to discharge.

In this area, the defendants each have the burden of proving that as an individual, they did not know nor reasonably should have known, either that politically motivated personnel transactions violated plaintiffs' first amendment rights or that the personnel transaction at issue was politically motivated.

No defendant here can be heard to say that he did not know or should not have known that party affiliation was an impermissible basis on which to found a personnel transaction. While neither the *Mt. Healthy* rationale nor the decision in *Elrod v. Burns*, supra was available to defendants at the time their actions were taken, the roots of the *Elrod* decision had been clearly established in *Illinois State Employees Union v. Lewis*, 473 F.2d 561 (7th Cir. 1972), *cert. denied* 410 U.S. 928, 93 S.Ct. 1364, 35 L.Ed.2d 590 (1973). While patronage dismissals had been the rule rather than the exception, the *Lewis* case held such transactions impermissible. The *Lewis* decision was not only delivered in the Seventh Circuit, but involved patronage practices in the Illinois Secretary of State's Office.

Under that circumstance, and with that authority available to them, I do not believe that any defendant can establish that they should not have known that party affiliation was an impermissible basis on which to found a personnel transaction. Thus, I believe it fair to say that each of the defendants knew or should have known that the personnel transactions asserted here, if politically motivated, were constitutionally impermissible.

With that predicate, the question remains whether each defendant knew or should have known that the acts he took, aided a politically motivated personnel transaction. Since a number of the individual defendants here are career civil service workers who have served under a number of administrations, both Republican and Democratic, it is unlikely that any of those defendants were personally motivated by political considerations. However, I believe if they knew or should have known that the actions they took were in aid of partisan political practices, they may be liable for the political motivations of others.

█ Two of the defendants, defendants Hannigan and Rhoads, had to know of the political motivations. Those two were present at the initial meeting where it was determined that the *Bradley* plaintiffs had to be returned, that an equivalent number of then current employees had to be laid off and that the method to be utilized to determine who was to be laid off was to find the employee who had actually viced or replaced the returning *Bradley* plaintiff. Those actions provided inferences which led me to conclude in Part III of this opinion that the personnel transactions involved were in fact politically motivated. Defendants Rhoads and Hannigan are responsible for those decisions. They have been unable to establish any basis for qualified immunity. They must be held liable for compensatory damages and attorneys' fees.

█ Three other defendants, Ronan, Knox and Jones, I believe have successfully established either that they individually took no action which aided in the violation of plaintiffs' rights or that they had no reason to know of the political motivation behind the transactions involved. They are entitled to qualified immunity and are not liable for any compensatory damages.

As to the remaining defendants, there are facts which would lead one to infer that they knew or should have known of the politically motivated nature of the personnel actions each individual defendant was ordered to take. However, at this point I expressly decline to find their individual liability for the reason that it appears unnecessary at this point.

During the pendency of this litigation, the State of Illinois enacted an indemnity provision for state employees. Public Act 80–1078 (December 3, 1977). Ch. 127, Ill. Rev.Stat. § 1302. The statute is intended to provide indemnity for any state employee who is named in a civil proceeding alleging the deprivation of a civil or constitutional right which arose out of any act or omission occurring within the scope of the employee's State employment. The Act provides in part:

(c) In any such proceeding unless the Court or jury finds that the conduct or inaction which gave rise to the claim or cause of action was intentional, willful or wanton misconduct and was not intended to serve or benefit interests of the State, the State shall indemnify the State employee for any damages awarded and court costs and attorneys' fees assessed as part of any final and unreversed judgment.

I believe that defendants Rhoads and Hannigan are entitled to indemnity under this provision. I decline to so hold only because the matter is not properly before me.

If that is the case, there appears no point in entering the thorny thicket of individual immunity for the remaining defendants. The defendants are jointly liable for compensatory damages and attorneys fees. Since two defendants have been found so liable and since I believe those two defendants are entitled to be indemnified by the State of Illinois, it appears of little moment

whether the remaining defendants are or are not entitled to immunity. However, should it appear at some later date that defendants Rhoads and Hannigan are not entitled to indemnity, I will not hesitate to enter the immunity thicket and determine the individual culpability of the remaining four defendants.

As to the matter of attorneys' fees sought under 42 U.S.C. § 1988 I believe they should be awarded in this action and so hold. They appear to be covered by the above quoted indemnity statute. However, if indemnity is not forthcoming, I note that under the recent United States Supreme Court case of *Hutto et al. v. Finney, et al.*, —— U.S. ——, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978), individual State departments, i. e., the Department of Personnel, the Department of Transportation, and the Department of Mental Health and thus, the State of Illinois, can be held liable for attorneys' fees under 42 U.S.C. § 1988 even though those State departments and the State itself are not party to the action. Since that statute was passed in order to enforce the fourteenth amendment, the State's eleventh amendment immunity from retroactive relief as found in *Edelman v. Jordan*, 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974) is no bar. *See, Fitzpatrick v. Bitzer*, 427 U.S. 445, 96 S.Ct. 2666, 49 L.Ed.2d 614 (1976) and *Hutto v. Finney, supra*, and *Bond v. Stanton*, 555 F.2d 172 (7th Cir. 1977).

In light of the fact that the defendants throughout have been represented by a Special Assistant Attorney General of the State of Illinois and with a view to the peculiar facts and circumstances of this case, I believe it would be appropriate that the attorneys' fee award be assessed against the present state officials in their official capacities and thus against the State departments and not the individual defendants. But, since the indemnity statute appears to reach the same result at this time, attorneys' fees in amounts to be determined later will be assessed against defendants Rhoads and Hannigan. Should indemnity not be forthcoming, this matter will be reconsidered on appropriate motion in light of the *Hutto* case.

In summary then, with the exception of plaintiff Barger, I find that the first amendment rights of all plaintiffs were violated. I further find that the rights of all defendants including plaintiff Barger were violated under the due process clause.

All plaintiffs were entitled to a mandatory permanent injunction requiring their return to work.

All plaintiffs, with the exception of plaintiff Barger, are entitled to compensatory damages in amounts to be determined later. Defendants Rhoads and Hannigan have no immunity and are jointly liable for these compensatory damages and attorneys' fees under 42 U.S.C. § 1988.

The individual liability of defendants Shelton, Miley and Bond are reserved.

Defendants Knox and Jones are not liable for any compensatory damages.

No plaintiffs are entitled to punitive damages.

Counsel for plaintiff is directed to prepare an order to this effect. Cause shall be set for proceedings in accord with this opinion at a later date.